335 F.3d 849
 CENTER FOR BIOLOGICAL DIVERSITY, a nonprofit corporation; Central AZ Paddlers Club, Plaintiffs-Appellants,
v.
Ann M. VENEMAN, Secretary of the United States Department of Agriculture; Dale Bosworth, Chief of United States Forest Service; Eleanor Towns, Regional Forester, United States Forest Service, Region Three; United States Forest Service, Defendants-Appellees.
 No. 02-16201.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 11, 2003.
 Filed July 7, 2003.
 
 Matthew K. Bishop, Western Environmental Law Center, Taos, NM, for the plaintiffs-appellants.
 Anna T. Katselas, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for the defendants-appellees.
 Appeal from the United States District Court for the District of Arizona; William D. Browning, District Judge, Presiding. D.C. No. CV 01-00477 WDB.
 Before: GOODWIN, TASHIMA, and WARDLAW, Circuit Judges.
 OPINION
 TASHIMA, Circuit Judge.
 
 
 1
 The Center for Biological Diversity and Central Arizona Paddlers Club (together the "Center") appeal from the dismissal of their action against the United States Forest Service (the "Forest Service" or "Service") for lack of subject matter jurisdiction. The Center brought suit for injunctive and declaratory relief under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq., claiming that the Service had violated the Wild and Scenic Rivers Act ("WSRA") by failing to consider, within the meaning of the WSRA, 57 rivers located in Arizona. The Center alleges that the Service, after identifying the rivers as eligible for inclusion in the Wild and Scenic Rivers System ("WSRS"), failed to fulfill an enforceable duty to amend its Forest Plans to prevent "potentially destructive activities" that jeopardize the eventual designation of the rivers. We have jurisdiction pursuant to 28 U.S.C. § 1291. We reverse and remand for further proceedings.
 
 BACKGROUND
 
 2
 Congress enacted the WSRA in 1968 to counter-balance the pro-development effects of the Federal Power Act of 1920. Although the Supreme Court has recognized the existence of "other subsidiary purposes," including "conservation, environmental, and antitrust" issues, Congress' overriding purpose in enacting the Power Act was to "assur[e] an abundant supply of electric energy throughout the United States with the greatest possible economy." NAACP v. FPC, 425 U.S. 662, 670 & nn. 5 & 6, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976) (quoting 16 U.S.C. § 824a(a)). The WSRA fundamentally altered federal water-way policies by requiring federal agencies to preserve and protect river segments that might otherwise be appropriate for development and damming. 16 U.S.C. §§ 1271-1287. To this end, the WSRA's preamble provides:
 
 
 3
 It is hereby declared to be the policy of the United States that certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values, shall be preserved in free-flowing condition, in that they and their immediate environments shall be protected for the benefit and enjoyment of present and future generations.
 
 
 4
 16 U.S.C. § 1271.
 
 
 5
 A river is eligible for protection under the WSRA if it flows freely and possesses one or more of the outstandingly remarkable values ("ORVs") set forth in § 1271. 16 U.S.C. § 1273(b). If the river satisfies these two requirements, it may be designated for inclusion in the WSRS through either an Act of Congress or an application by a Governor (or her designee), acting pursuant to an act of the state legislature declaring the river wild, scenic, or recreational. 16 U.S.C. § 1273(a). The WSRA also requires the Secretaries of the Interior and Agriculture to conduct "specific studies and investigations" to discover rivers eligible for inclusion in the WSRS. 16 U.S.C. § 1276(d)(1).
 
 
 6
 In 1993, the Arizona congressional delegation requested that the Forest Service prepare a report identifying any stream or river segments in Arizona that satisfy the statutory requirements for inclusion in the WSRS. The Forest Service agreed and, during the course of the year, it conducted three separate studies of Arizona's free-flowing rivers. On completing its final inventory of the state's "potential additions" to the WSRS, the Forest Service published its findings in a 300-page report (the "1993 Report"). The 1993 Report identified 57 rivers and streams that qualified as potential additions to the WSRS and provided information on location, certain ORVs, classification, land uses and development, and social and economic values. The 1993 Report also listed the rivers deemed "ineligible" for inclusion either because they did not flow freely or because they did not have an identifiable ORV. The 1993 Report thus provided all of the necessary information to determine which Arizona stream or river segments met the WSRA's criteria for designation.
 
 
 7
 Since the Service's initial determination that the 57 rivers qualified for inclusion in the WSRS, the Service allegedly has failed to consider the rivers as potential WSRS segments in planning for the national forests and immediate surrounding areas. As a result of this alleged inaction, the Center brought suit against the Forest Service for failing to comply with 16 U.S.C. § 1276(d)(1), which directs the government to take rivers and streams that qualify for inclusion in the WSRS into account while planning for the use and development of federal land. The Center alleges that by failing to consider the 57 rivers to be potential WSRS segments while planning, the Service has violated a mandatory requirement of § 1276(d)(1). The district court dismissed the Center's action for lack of subject matter jurisdiction, reasoning that the Center failed to allege either final agency action or adequate agency inaction, as required under the APA. This timely appeal followed.
 
 DISCUSSION
 
 8
 The Center contends that the Forest Service's failure to consider and protect the 57 rivers identified in the 1993 Report constitutes "agency action unlawfully withheld or unreasonably delayed," challengeable under the APA, 5 U.S.C. § 706(1). It also insists that the Service's failure to consider the rivers identified in the 1993 Report constitutes challengeable "final agency action" under 5 U.S.C. § 704.[1] A dismissal for lack of subject matter jurisdiction is a question of law reviewed de novo. United States v. Peninsula Communications, Inc., 287 F.3d 832, 836 (9th Cir.2002).
 
 I. Final Agency Action
 
 9
 Because the WSRA does not include an independent cause of action, the Center must rely on the APA to establish subject matter jurisdiction. Hells Canyon Alliance v. United States Forest Serv., 227 F.3d 1170, 1176 (9th Cir.2000). Under the APA, this court "intervene[s] in the administration of the laws only when, and to the extent that, a'final agency action' has an actual or immediate threatened effect." Ecology Ctr., Inc. v. United States Forest Serv., 192 F.3d 922, 925-26 (9th Cir.1999) (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 894, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)). The APA requires reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). To be final for purposes of judicial review, the action must mark the "consummation" of the agency's decision-making process, and must "be one by which rights or obligations have been determined, or from which legal consequences will flow." Alaska Dep't of Envtl. Conservation v. EPA, 244 F.3d 748, 750 (9th Cir.2001) (quoting Bennett v. Spear, 520 U.S. 154, 177-78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)).
 
 
 10
 The Center argued to the district court that the 1993 Report satisfied the APA's final action requirement. We disagree. The mere act of inventorying the rivers is not enough to "mark the consummation" of the Forest Service's decisionmaking process. Determining whether a river flows freely and possesses at least one ORV constitutes the first step in the § 1276(d)(1) designation process. See Wild & Scenic River Study Process, Technical Report Prepared for the Interagency Wild and Scenic Rivers Coordinating Council, at 9 (Dec.1999) ("Wild Rivers Technical Report"), available at http://www.nps.gov/riverspublications.hmtl. Step two requires the relevant federal agency to make a "suitability determination." Id. at 17; Interagency Guidelines for Eligibility, Classification and Management of River Areas, 47 Fed.Reg. 39, 454, 39, 456 (Sept. 7, 1982). This is a policy decision that takes into account factors such as potential conflicts with future uses and state or local interests in the river. Once the river is deemed eligible and suitable, the final step and decision on designation belongs to Congress. Wild Rivers Technical Report, at 21.
 
 
 11
 Because the 1993 Report is not the final step in the § 1276(d)(1) designation process, it does not reflect the type of definitive policy statement usually associated with final decisions reviewable under § 706(2). See, e.g., Mont. Wilderness Ass'n, Inc. v. United States Forest Serv., 314 F.3d 1146, 1150 (9th Cir.2003) (holding that completion of forest management plan, not interim maintenance, constitutes "consummation of the decision making process"). Accordingly, we conclude that the inventorying of the rivers did not constitute final agency action. To the extent the Center claims that the Forest Service has unreasonably delayed taking the next step, or has failed to consider the inventoried rivers in the interim, its claims fall under 5 U.S.C. § 706(1), to which we now turn.
 
 II. Unreasonable Failure to Act
 
 12
 The Center contends that even if the Service's failure to protect the 57 river segments is not considered final agency action under § 706(2), its claims are still ripe for judicial review pursuant to § 706(1). That provision permits the court to review claims to compel "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); see also Independence Mining Co. v. Babbitt, 105 F.3d 502, 507 (9th Cir.1997). The Center contends that the Forest Service has unreasonably failed to consider the potential rivers in planning, as required by 16 U.S.C. § 1276(d)(1), and therefore has unlawfully withheld or unreasonably delayed performing a mandatory responsibility to consider the 57 rivers.
 
 
 13
 The Service contends, first, that it has not officially identified the eligible rivers in Arizona, and until it does, it has no statutory duty to consider or protect the rivers listed in the 1993 Report. Second, it insists that, in contrast to the express duty to protect rivers under § 1276(a) in cases where Congress directly designates or identifies a river, § 1276(d)(1) does not include an express interim duty to protect rivers that the Service identifies through the inventorying process.[2]
 
 
 14
 To establish a right to review under § 706(1), the Center must identify a statutory provision mandating agency action. "Judicial review is appropriate if the [plaintiff] makes a showing of `agency recalcitrance... in the face of clear statutory duty or ... of such a magnitude that it amounts to an abdication of statutory responsibility.'" Mont. Wilderness, 314 F.3d at 1150 (quoting ONRC Action v. Bureau of Land Mgmt., 150 F.3d 1132, 1137 (9th Cir.1998)). In addition to identifying a statutory mandate, the Center must demonstrate that the Forest Service genuinely failed to pursue the statutory mandate. Ecology Ctr., 192 F.3d at 926.
 
 A. Mandatory Duty to Act
 
 15
 To establish the Service's mandatory duty to act, the Center relies on the first sentence of § 1276(d)(1).
 
 
 16
 In all planning for the use and development of water and related land resources, consideration shall be given by all Federal agencies involved to potential national wild, scenic and recreational river areas, and all river basin and project plan reports submitted to the Congress shall consider and discuss any such potentials.
 
 
 17
 16 U.S.C. § 1276(d)(1) (emphases added). The passage raises two issues. Does the 1993 Report prepared for the Arizona delegation identify "potential" WSRS rivers, and if so, is the duty to "consider" those rivers mandatory and enforceable against the Service?
 
 
 18
 The threshold issue is whether the 1993 Report constitutes an inventory of Arizona's potential WSRS additions. If the rivers have yet to be officially identified, the Center, to prevail, must first establish that § 1276(d)(1) imposes a mandatory duty to inventory. The Center, however, expressly distances itself from this argument, as § 1276(d)(1) provides little support for such a claim. Indeed, although the Center never directly pleaded such a claim, the district court limited its holding to this very issue, stating that nothing in § 1276(d)(1) requires the Service to inventory rivers. If, however, the 1993 Report constitutes a list of potential WSRS rivers, § 1276(d)(1) provides that "consideration shall be given" to such rivers while planning for development of or near the rivers.
 
 
 19
 The 1993 Report "provides resource information for potential wild, scenic, and recreational rivers on six National Forests in Arizona." In a similar passage, the Report states that its purpose is to provide information on those rivers that the Forest Service "determine[s] to be potentially eligible for inclusion in the national wild and scenic rivers systems." (Emphasis added.) Despite this plain language, the Service argues that the Report is not an official study of potential WSRS rivers because it was not issued pursuant to the Service's joint guidelines promulgated by the Departments of the Interior and Agriculture. See Interagency Guidelines for Eligibility, Classification and Management of River Areas, 47 Fed.Reg. 39,454 (Sept. 7, 1982). These guidelines apply to rivers both designated for study by an Act of Congress under 16 U.S.C. § 1276(a) and identified for study under 16 U.S.C. § 1276(d)(1). As already noted, for rivers added to the WSRS through the inventory process, the Forest Service determines the eligibility of a particular river first by establishing whether the river is free-flowing and possesses one or more ORV. If the river is found to have both characteristics, the Service classifies the river as "wild," "scenic," or "recreational." Once the river has been deemed "eligible," the Service conducts a suitability study before Congress makes the ultimate decision regarding designation.
 
 
 20
 The Forest Service argues that because it typically chooses to implement these procedures during the two-tiered forest planning process set forth in the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 et seq., any study prepared outside this preferred land-use planning process, including the 1993 Report, is not a list of potential WSRS rivers. Because the land-use planning process is not the only method by which the Service identifies eligible rivers, we disagree. The Service itself acknowledges in its own documents that it sometimes identifies eligible rivers through independent studies such as that conducted for the Arizona delegation. See Wild Rivers Technical Report, at 10 (recognizing that "WSR evaluation" may be completed through "site-specific (project-level) planning"). Moreover, the WSRA itself does not require the identification of rivers through the NFMA's land use procedure.
 
 
 21
 The 1993 Report conforms to the dictates of the WSRA by expressly identifying the two statutory characteristics of an eligible river, first, that it is free-flowing, and second, that it possesses at least one ORV. Although the Forest Service highlights a number of alleged procedural flaws with the 1993 Report, none of which we find particularly persuasive, it fails to highlight a single substantive flaw with the Report. The 1993 Report expressly covers the statutory requirements for achieving eligibility. We therefore reject the Forest Service's argument that the 1993 Report, although plainly intended to identify Arizona's eligible WSRS rivers, is not an eligibility study because the Service would rather avoid liability for possible delay. Finally, we find it persuasive that the rivers included in the 1993 Report have been listed on the Nationwide Rivers Inventory ("NRI"), "a register of river segments that potentially qualify as national wild, scenic or recreational river areas," maintained by the National Park Service "[i]n partial fulfillment of [16 U.S.C. § 1276(d)]." Nationwide Rivers Inventory, available at http://www.nps.gov/ncrc/programs/rtca/nri/auth.hmtl.
 
 
 22
 Having concluded that the 1993 Report constitutes an inventory of Arizona's eligible rivers, the next question is whether § 1276(d)(1) imposes a mandatory requirement that the Service give consideration to all potential rivers in planning for the use and development of land resources. The Center contends that the Forest Service indeed has an enforceable duty to consider the eligible rivers while planning and, in particular, to avoid any plans that might threaten the eventual designation of eligible rivers. The Center argues that by failing to consider the 57 rivers identified in the 1993 Report, the Forest Service may have destroyed one or more of the ORVs that make each river eligible for the WSRS.
 
 
 23
 In Montana Wilderness, we considered a similar claim of agency inaction under the Montana Wilderness Study Act ("Study Act"). 314 F.3d at 1148. Similar to the requirement of § 1276(d)(1) to "consider" all rivers in planning, the Study Act instructed the Forest Service "to maintain [potential wilderness study areas in] their presently existing wilderness character and potential for inclusion in the [Wilderness System]." Id. at 1148 (emphasis in the original). Plaintiffs alleged that the Service violated the Study Act by failing to maintain the "wilderness character and potential for wilderness designation" in allowing motorized vehicles use of the land. Id. at 1147. The district court dismissed for lack of subject matter jurisdiction. In reversing, we emphasized that the Study Act "establishes a management directive requiring the Forest Service to administer the Study Areas to `maintain' wilderness character and potential for inclusion in the Wilderness System." Id. at 1151. We reasoned that, in contrast to ONRC Action, in which the statute at issue set forth mere policy statements and general guidance, "the Forest Service's duty to maintain wilderness character and potential [under the Study Act] is a nondiscretionary, mandatory duty that it [can] be compelled to carry out under section 706(1)." Id.
 
 
 24
 As in Montana Wilderness, the requirement here that the Service shall "consider" eligible rivers is readily distinguished from the generalized policy statements that we considered in ONRC Action. ONRC Action, 150 F.3d at 1139-40. The consideration requirement in this case is neither a statement of policy, nor a generalized instruction to federal agencies that may be overlooked. Rather, in the context of the WSRA designation process, the duty to consider eligible rivers while planning means that federal agencies must consider the future designation of an eligible river when planning for that river and its immediate area. Although, unlike the Study Act, § 1276(d)(1) does not require preservation or maintenance, it does require federal agencies to obtain site-specific information to discern the effect of any action on the river's eligibility for designation.
 
 
 25
 This consideration requirement does not necessarily preclude the agency from taking action, but it does require the agency to openly study, consider and discuss the action before taking it. Though substantively distinct, this duty is not distinguishable from the duty to "maintain" that we found mandatory in Montana Wilderness. In both cases, the applicable provision instructs the federal agency that it shall perform a task provided that the object sought to be conserved satisfies the statutory requirements. We thus conclude that the duty to consider, like the duty to maintain, constitutes a mandatory duty to act. The Center can obtain relief to the extent it can show that the Forest Service has failed to consider the effect of an adverse planning decision on an eligible river. The consideration duty, as explained, however, must be construed narrowly and distinguished from a duty to maintain or a duty to protect under any circumstances. The duty to consider requires only that the Forest Service study and discuss the full effect of its decisions on a river eligible for inclusion in the WSRS. Therefore, although § 1276(d)(1) does not include an express interim duty to protect, it does include an interim duty to consider eligible rivers while planning.
 
 B. Genuine Failure to Act
 
 26
 Finally, we consider whether the Center has alleged facts demonstrating the Service's genuine failure to satisfy its mandatory duty. This court permits jurisdiction under the limited exception to the finality doctrine only where the party establishes a genuine failure to act. Ecology Ctr., 192 F.3d at 926. We do not require strict conformity with any regulations, but "[t]he simple fact that the Forest Service has taken some action to address the Act is not sufficient to remove [a] case from section 706(1) review." Mont. Wilderness, 314 F.3d at 1151.
 
 
 27
 The Service contends that it has satisfied the duty to act requirement because it has a policy of addressing eligible rivers through its national land-use planning process. We recently rejected this type of generalized defense in Montana Wilderness. In that case, we held that awareness alone of the obligation to maintain wilderness character was insufficient to satisfy the statutory requirements, because awareness "did not assess whether wilderness character and potential had actually been maintained in the study areas." Id. (emphasis added). Similarly here, the Service claims it intends to act the next time each of the forest plans must be revised pursuant to the NFMA. An intention to consider the rivers cannot satisfy a requirement that the agency actually have considered the rivers. Further, the Service's reference to the grazing permit process and other possible methods by which the Center could protect a river is insufficient to satisfy the duty to act requirement.
 
 CONCLUSION
 
 28
 The Forest Service had a mandatory duty under § 1276(d)(1) of the WSRA to consider the 57 rivers identified in the 1993 Report. Because the Service has failed to act on this duty, the second requirement for review under § 706(1) of the APA is satisfied. We therefore reverse the judgment of the district court dismissing the Center's action for lack of subject matter jurisdiction and remand for further proceedings consistent with this opinion.
 
 
 29
 REVERSED and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 CitingSteel Co. v. Citizens for a Better Env't, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), the Center also contends that the district court erred in reaching the merits before addressing the jurisdictional questions. Because of our disposition, we need not fully consider this issue. Where, however, the scheme in question actually incorporates the preliminary inquiry, the rule in Steel Co. does not dictate the order of analysis. Here, the statutory scheme includes the sovereign immunity inquiry, Gallo Cattle Co. v. United States Dep't of Agric., 159 F.3d 1194, 1198-99 (9th Cir.1998), which may be addressed in a motion to dismiss, prior to the merits. See Powelson v. United States, 150 F.3d 1103, 1105 (9th Cir.1998). Thus, because 5 U.S.C. § 706(1) requires the court to establish a mandatory duty to act as part of the immunity inquiry, the district court properly addressed the merits in a motion to dismiss.
 
 
 [2]
 At oral argument, the Forest Service appeared to concede that § 1276(d)(1) applies to the 57 rivers identified in the 1993 Report, and thus, that the Service has the interim duty to protect them. We need not determine whether such a concession was made, however, because we can decide this case without relying on it