**THE WILDERNESS SOCIETY; Alaska Center for the Environment, Plaintiffs–Appellants,**

**v.**

**UNITED STATES FISH & WILDLIFE SERVICE, Defendant–Appellee.**

**No. 01–35266.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted En Banc Sept. 16, 2003.

Filed Dec. 30, 2003.

Rebecca L. Bernard and Jack K. Sterne, Trustees For Alaska, Anchorage, AK, for the plaintiffs-appellants.

Kathryn E. Kovacs, U.S. Department of Justice, Environment and Natural Resources Division, Washington, D.C., for the defendant-appellee.

Before SCHROEDER, Chief Judge, PREGERSON, REINHARDT, T.G. NELSON, HAWKINS, SILVERMAN, WARDLAW, W. FLETCHER, GOULD, BERZON, and CLIFTON, Circuit Judges.

## OPINION

GOULD, Circuit Judge.

We consider an action brought by the Wilderness Society and the Alaska Center for the Environment ("Plaintiffs") challenging a decision by the United States Fish and Wildlife Service ("USFWS"), to grant a permit for a sockeye salmon enhancement project ("Enhancement Project") that annually introduces about six million hatchery-reared salmon fry into Tustumena Lake, the largest freshwater lake in the Kenai National Wildlife Refuge ("Kenai Refuge") and the Kenai Wilderness. Plaintiffs assert that the USFWS permit for the Enhancement Project violated the Wilderness Act, 16 U.S.C. §§ 1131–1136, by offending its mandate to preserve the "natural conditions" that are a part of the "wilderness character" of the Kenai Wilderness, id. §§ 1131, 1133, and by sanctioning an impermissible "commercial enterprise" within a designated wilderness area. Id. § 1133(c). Plaintiffs also claim that the Enhancement Project violates the National Wildlife Refuge Administration Act of 1966, 16 U.S.C. §§ 668dd–668ee ("Refuge Act"), because the project is not consistent with the purposes of the Kenai Refuge as set forth in the Refuge Act. Id. § 668dd. The district court denied Plaintiffs' motion for summary judgment and sua sponte entered summary judgment in favor of the USFWS. After final judgment was entered a timely appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1331. We conclude that the district court erred in finding that the Enhancement Project is not a "commercial enterprise" that Congress prohibited within the designated wilderness. We reverse and remand so that the final decision of the USFWS may be set aside, the Enhancement Project enjoined, and judgment entered for Plaintiffs.

## I

### A

The area now known as the Kenai Refuge has been recognized as protected wilderness by the federal government for more than sixty years.[1] In 1941, President Franklin D. Roosevelt issued an Executive Order designating about two million acres of land on Alaska's Kenai Peninsula, including Tustumena Lake, as the Kenai National Moose Range for the purpose of "protecting the natural breeding and feeding range of the giant Kenai moose." Exec. Order No. 8979, 6 Fed. Reg. 6471 (Dec. 16, 1941).

In 1964 Congress passed the Wilderness Act, which established the National Wilderness Preservation System with the explicit statutory purpose "to assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and protection in their natural condition." 16 U.S.C. § 1131(a). Congress thereby expressed support for the principle that wilderness has value to society that requires conservation and preservation. As President Lyndon B. Johnson reportedly said upon signing of the Wilderness Act in 1964, "[i]f future generations are to remember us with gratitude rather than contempt, we must leave them more than the miracles of technology. We must leave them a glimpse of the world as it was in the beginning, not just after we got through with it." National Park Service, Grand Canyon National Park Wilderness Management Plan 1–2 (1989), *available at* http://www.nps.gov/grca/wilderness/documents/ sec-one.pdf.[2]

The Wilderness Act required the Secretary of the Interior to make recommenda-

---

1. The material facts essential to determine this case are undisputed by the parties.

2. For views of conservationists who focused on the unspoiled areas of the western United

tions to the President as to the suitability of existing national parks, refuges, and game ranges for preservation as wilderness. 16 U.S.C. § 1132(c). Upon recommendation of the President, Congress was empowered to designate existing national park, wildlife refuge, and game range lands as wilderness. *Id.*[3]

Two years after enacting the Wilderness Act, Congress passed the Refuge Act for the purpose of "consolidating the authorities relating to the various categories of areas that are administered ... for the conservation of fish and wildlife." 16 U.S.C. § 668dd(a)(1). In furtherance of this goal, the Refuge Act established the "National Wildlife Refuge System," under the administration of USFWS. *Id.*

In 1980, Congress enacted the Alaska National Interest Lands Conservation Act ("ANILCA"), Pub.L. No. 96–487, Title III, § 702(7), 94 Stat. 2371 (1980), to control the management of Alaska refuge lands. ANILCA expanded the Kenai National Moose Range by nearly a quarter-million acres, renamed it the Kenai National Wildlife Refuge, ANILCA § 303(4); 16 U.S.C. § 668dd notes, and further set aside 1.35 million acres of the Refuge, including Tustumena Lake, as the Kenai Wilderness, a designated wilderness pursuant to Congress's authority to protect lands under § 1132(c) of the Wilderness Act. ANILCA § 702(7); 16 U.S.C. § 1132(c) & notes. ANILCA recited that the purposes of the Kenai Refuge encompass, among other aims, the "conserv[ation of] fish and wildlife populations and habitats in their natural diversity." ANILCA § 303(4).

**B**

Tustumena Lake lies near the western edge of the Kenai Refuge and within the Kenai Wilderness. Tustumena Lake is the largest freshwater lake located within the Kenai Refuge and is the fifth largest freshwater lake in the State of Alaska. The lake's outlet is the Kasilof River, which drains into the Cook Inlet, a tidal estuary that flows into the Gulf of Alaska and the Pacific Ocean.

As a result of its remote location, the ecosystem around and within Tustumena Lake is in a natural state. This ecosystem supports several species of anadromous fish, including sockeye salmon, which spawn within the Kasilof River watershed. A commercial fishing fleet, operating outside the boundaries of the Kenai Refuge, intercepts and harvests these sockeye salmon during their annual run from the Gulf of Alaska back to the Kasilof River, Tustumena Lake, and other spawning streams.

The antecedents of the present Enhancement Project date back to 1974, when the Alaska Department of Fish and Game ("ADF & G") first conducted a sockeye salmon egg collection at Tustumena Lake as part of a research project designed to test the ability of the ecosystem to produce fish. The eggs were incubated at the Crooked Creek Hatchery, outside of the Kenai Refuge, and the resulting fry were stocked outside of the Kenai Refuge in the spring of 1975. In 1976, fry were first released into Tustumena Lake, and since have been released into Tustumena Lake in all but two subsequent years. The number of fry stocked yearly in Tustumena Lake has ranged from a low of 400,000 in 1978 to a high of 17,050,000 in 1984. Since 1987, the number of fry released annually into the lake has been slightly greater than 6 million.

States, see the selected bibliography in Peter Wild, Pioneer Conservationists of Western America 209–36 (Mountain Press Publishing Co.1979).

**3.** Congress also may withdraw lands from designated wilderness after a similar process. *See* 16 U.S.C. 1132(e).

Before 1980, ADF & G operated the Enhancement Project without a special use permit, and ADF & G did not seek permits for the operation of the project. In 1980, following passage of ANILCA, the USFWS's Refuge Manager for the Kenai Refuge notified ADF & G that special use permits would be required for all ongoing projects within the Refuge. In 1985, the USFWS and ADF & G entered into a Memorandum of Understanding that allowed ADF & G annually to obtain a special use permit for the Enhancement Project to study the effect of stocking on native lake fish and on the incidence of disease within the fish population.

In 1989, the USFWS and ADF & G reached a joint agreement that by 1993 a decision should be made either to discontinue the research project at Tustumena Lake or to elevate it to enhance commercial fishing operations for the benefit of the Cook Inlet fishing industry. In a 1992 report, ADF & G requested that the project become an operational enhancement project. This report cited two reasons for conversion of the project. First, ADF & G concluded that the risk of adverse impacts on the Tustumena Lake ecosystem appeared to be lowered at a stocking rate of about 6 million fry per year. Second, ADF & G noted that, beginning in fiscal year 1992, a reduced state budget would require curtailing project evaluation. In 1993, ADF & G entered into a contract with the Cook Inlet Aquaculture Association ("CIAA") to staff and run the Crooked Creek Hatchery and its hatchery programs.

The CIAA is a private, non-profit corporation "comprised of associations representative of commercial fishermen in the region" as well as "other user groups interested in fisheries within the region." Alaska Stat. § 16.10.380(a) (2003). According to the USFWS's final Environmental Assessment of the Enhancement Project, the CIAA is "organized for the purpose of engaging in salmon enhancement work throughout the Cook Inlet Region." The mission statement of the CIAA, according to the Environmental Assessment, is to:

(1) protect self-perpetuating salmon stocks and the habitat upon which they depend; (2) rehabilitate self-perpetuating salmon stocks; (3) rehabilitate salmon habitat and (4) maximize the value of the Cook Inlet ... common property salmon resources by applying science and enhancement technology to supplement the value attained from protection and habitat rehabilitation of self-perpetuating salmon stocks.

The CIAA relies on funding from two sources. First, the Cook Inlet commercial salmon industry imposes a voluntary two percent tax on the value of its fishermen's annual salmon harvest. Second, the CIAA generates income through producing hatchery-raised salmon from the surplus fry not used to stock Tustumena Lake.

In May 1994, the USFWS's Regional Director contacted ADF & G in order to implement an evaluation of the Enhancement Project's status and its future. Acknowledging that the Enhancement Project was initiated as an experimental project with the purpose of "supplement[ing] the commercial sockeye salmon fishery in the Cook Inlet," the Regional Director set forth environmental concerns regarding the project and recommended that the Enhancement Project be evaluated through the National Environmental Policy Act ("NEPA") review process. Among the concerns raised were that the Enhancement Project potentially violated "the intent and purpose of the Wilderness Act, ANILCA, and regional policy," and that the project would threaten "a unique, glacial, natural freshwater spawning and rearing aquatic ecosystem ... merely to provide additional

economic benefit primarily for Cook Inlet east side net fishermen."

In late 1995, the CIAA submitted a draft Environmental Assessment ("EA") to the USFWS for comment and review. *See* 40 C.F.R. § 1506.5(b) (2003); 550 FW 1 § 2.5(E)(2002 draft). The draft assessment proposed consideration of five action alternatives, from a total elimination of the Enhancement Project to a tripling of the number of salmon fry stocked in Tustumena Lake, and recommended that the Enhancement Project continue at the same scale, with an annual stocking of about six million fry. After circulation and agency comment on the 1995 draft, in June 1997 the USFWS and the CIAA jointly released a draft EA of the Enhancement Project, which addressed concerns regarding the project, but the USFWS in a separate document concluded that mitigation measures could minimize risks of the project. During the 45–day period for public comment and review, the Wilderness Society submitted comments challenging the legality of "any fisheries enhancement program in designated Wilderness for the purpose of providing for the stocking of commerce" and questioning the compatibility of the project with the area's wilderness designation. In August 1997, the final EA of the Enhancement Project was released. In a simultaneously released "Mitigated Finding of No Significant Impact," the USFWS concluded that "mitigative measures" contained in the Special Use Permit would minimize risks associated with the Enhancement Project, and that preparation of an Environmental Impact Statement was not required.

Also in August 1997, the Kenai Refuge Manager issued a Wilderness Act Consistency Review, addressing legal concerns regarding whether the Enhancement Project was consistent with the Wilderness Act's mandate to preserve wilderness in its natural condition and whether the project was a prohibited commercial enterprise. Referring to a legal opinion prepared by the United States Department of Interior's Regional Solicitor's Office, which concluded that the Enhancement Project "does not have to contribute to achieving Refuge purposes but it may not significantly conflict with them," the Kenai Refuge Manager, in the Consistency Review, dismissed concerns that the project altered natural conditions and was a commercial enterprise. The Kenai Refuge Manager concluded that the Enhancement Project was consistent with the Wilderness Act, which he viewed as a legislative compromise not reflecting absolute preservationist values. The Refuge Manager also suggested that, because the State of Alaska had previously administered the project, criticism that the Enhancement Project was a commercial enterprise raised "a distinction without a difference." In August 1997, the Refuge Manager also released a Compatibility Determination, which concluded that the Enhancement Project "cannot . . . be considered as supporting refuge purposes, but neither can it be found incompatible with them."

After issuance of these documents, the USFWS on August 8, 1997, issued a Special Use Permit to the CIAA for the Enhancement Project. Under the terms of this permit, each summer the CIAA establishes a temporary camp within the Kenai Wilderness at the mouth of Bear Creek, which flows into Tustumena Lake, and catches about 10,000 returning sockeye salmon, which yield about 10 million eggs. These eggs are transported to a hatchery outside the Kenai Wilderness.[4] The following spring about six million salmon fry produced by the eggs are stocked and returned to the wilderness in Bear Creek.

---

4. The Crooked Creek Hatchery closed in 1996, and hatchery operations related to the Enhancement Project were transferred to the Trail Lakes Hatchery.

## II

The Administrative Procedure Act ("APA") governs judicial review of agency action. 5 U.S.C. § 701 *et seq.* Under the APA, we may set aside formal agency action only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A); *Center for Biological Diversity v. Veneman,* 335 F.3d 849, 853 (9th Cir.2003).[5]

### A

There is disagreement among the parties as to what level of deference, if any, we should accord the USFWS's decision to permit the Enhancement Project. Defendant USFWS maintains that the case is controlled by *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and that USFWS decisions interpreting the Wilderness Act and Refuge Act must be given broad deference. Plaintiffs, on the other hand, argue that the challenged project offends the literal terms of the Wilderness Act by not preserving the designated wilderness area and by sanctioning a commercial enterprise within it. Responding to the defendant's argument for *Chevron* deference, which was adopted by the district court, Plaintiffs rely on the Supreme Court's clarification of *Chevron* in *United States v. Mead Corp.,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), urging that the USFWS's permitting decision is entitled at most to "respect" as set forth in *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

■■■■ In *Chevron,* the Supreme Court set forth a two-step test for judicial review of administrative agency interpretations of federal law. Under the first step: "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778. Congressional intent may be determined by "traditional tools of statutory construction," and if a court using these tools ascertains that Congress had a clear intent on the question at issue, that intent must be given effect as law. *Id.* at 843 n. 9, 104 S.Ct. 2778; *see Defenders of Wildlife v. Browner,* 191 F.3d 1159, 1164 (9th Cir.1999) (stating that questions of congressional intent "are still firmly within the province of the courts under *Chevron*"). Conversely, at step two of *Chevron,* when applicable, we recognize that if a statute is silent or ambiguous with respect to the issue at hand, then the reviewing court must defer to the agency so long as "the agency's answer is based on a permissible construction of the statute." 467 U.S. at 843, 104 S.Ct. 2778. In such a case an agency's interpretation of a statute will be permissible, unless "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. 2778.

*Chevron* considered only formal notice-and-comment rule-making and did not state what other types of agency decisions should be given such deference. In *Mead,* the Supreme Court clarified that "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, *and* that the agency interpretation claiming deference was promulgated in the exercise of that authority." 533 U.S. at 226–27, 121 S.Ct. 2164 (emphasis added).[6]

---

**5.** We review de novo a district court's order granting or denying summary judgment.

*United States v. City of Tacoma,* 332 F.3d 574, 578 (9th Cir.2003).

**6.** Although *Mead* did not state with specificity

*Mead* also clarified the weight that a reviewing court should give to administrative decisions not meeting these standards. Quoting *Skidmore*, the Court held that the deference to be accorded to such decisions depends upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Mead*, 533 U.S. at 228, 121 S.Ct. 2164(quoting *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161).

With the Supreme Court's precedents in mind, we adopt the following analysis: Under *Chevron's* first-step test, we ask whether the Enhancement Project offends the plain meaning and manifest congressional intent of the Wilderness Act or the Refuge Act. If so, Congress's intent must be enforced and that is the end of the matter. Conversely, if the statutory terms are ambiguous, then we must give *Chevron* deference only upon a conclusion that the USFWS's statutory interpretation has the "force of law." Otherwise, we give the USFWS's view respect if persuasive based on the factors recited in *Skidmore* and endorsed in *Mead*.

**B**

Addressing the first step in the *Chevron* analysis, we ask "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842, 104 S.Ct. 2778. "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.* at 843 n. 9, 104 S.Ct. 2778.

Canons of statutory construction help give meaning to a statute's words. We begin with the language of the statute. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) ("It is well settled that the starting point for interpreting a statute is the language of the statute itself.") (internal quotation marks and citation omitted); *Assoc. to Protect Hammersley, Eld & Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1015 (9th Cir.2002). Another fundamental canon of construction provides that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *United States v. Smith*, 155 F.3d 1051, 1057 (9th Cir.1998) (quoting *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)); *United States v. Iverson*, 162 F.3d 1015, 1022 (9th Cir.1998).

It is also "a fundamental canon that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (quoting *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989)). If necessary to discern Congress's intent, we may read statutory terms in light of the purpose of the statute. Thus, the structure and purpose of a statute may also provide guidance in determining the plain meaning of its provisions. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988) ("In ascertaining the plain meaning of [a] statute, the court must look to the particular

what types of agency powers are indicative of authority "generally to make rules carrying the force of law," the Court provided this guidance: "Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent." 533 U.S. at 227, 121 S.Ct. 2164.

statutory language at issue, as well as the language and design of the statute as a whole."); *United States v. Lewis,* 67 F.3d 225, 228–29 (9th Cir.1995) ("Particular phrases must be construed in light of the overall purpose and structure of the whole statutory scheme."). If, under these canons, or other traditional means of determining Congress's intentions, we are able to determine that Congress spoke clearly to preclude the Enhancement Project, then we may not defer to the USFWS's contrary interpretation. *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 512, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) ("Where the language of the statute is clear, resort to the agency's interpretation is improper.").

■ With these principles in mind, we assess Plaintiffs' contention that the Enhancement Project offends the Wilderness Act. Most pertinent to our analysis is the Wilderness Act's prohibition of commercial enterprise within designated wilderness. Section 4(c) of the Wilderness Act states that, subject to exceptions not relevant here, "there shall be no commercial enterprise ... within any wilderness area." 16 U.S.C. § 1133(c). The Wilderness Act does not define the terms "commercial enterprise" or "within." The district court considered these terms ambiguous and concluded that they do not bar the Enhancement Project.

Because no statutory or regulatory provision expressly defines the meaning of the term "commercial enterprise" as used in the Wilderness Act, we first consider the common sense meaning of the statute's words to determine whether it is ambiguous. *See Iverson,* 162 F.3d at 1022. Webster's defines "enterprise" to mean "a project or undertaking." Webster's Ninth New Collegiate Dictionary 415 (1985). Webster's defines "commercial" as "occupied with or engaged in commerce or work intended for commerce; of or relating to commerce." *Id* at 264–65. The American

Heritage Dictionary of the English Language provides a strikingly similar definition, viewing "commercial" as meaning "1.a. of or relating to commerce, b. engaged in commerce, c. involved in work that is intended for the mass market." American Heritage Dictionary of the English Language 371 (4th ed.2000). Black's Law Dictionary adds that "commercial" may be defined as "relates to or is connected with trade and traffic or commerce in general; is occupied with business or commerce." Black's Law Dictionary 270 (6th ed.1990). These definitions suggest that a commercial enterprise is a project or undertaking of or relating to commerce.

We also consider the purposes of the Wilderness Act. The Act's declaration of policy states as a goal the "preservation and protection" of wilderness lands "in their natural condition," so as to "leave them unimpaired for future use and enjoyment as wilderness and so as to provide for the protection of these areas, [and] the preservation of their wilderness character." 16 U.S.C. § 1131(a). The Wilderness Act further defines "wilderness," in part, as "an area where the earth and its community of life are untrammeled by man." *Id.* § 1131(c). These statutory declarations show a mandate of preservation for wilderness and the essential need to keep commerce out of it. Whatever else may be said about the positive aims of the Enhancement Project, it was not designed to advance the purposes of the Wilderness Act. The Enhancement Project to a degree places the goals and activities of commercial enterprise in the protected wilderness. The Enhancement Project is literally a project relating to commerce.

The structure of the relevant provisions of the Wilderness Act may also be considered. The Wilderness Act's opening section first sets forth the Act's broad mandate to protect the forests, waters and

creatures of the wilderness in their natural, untrammeled state. 16 U.S.C. § 1131. Section 1133, devoted to the use of wilderness areas, contains a subsection entitled "[p]rohibition provisions." *Id.* § 1133(c). Among these provisions is a broad prohibition on the operation of all commercial enterprise within a designated wilderness, except as "specifically provided for in this Act." *Id.* The following subsection of the Act enumerates "special provisions," including exceptions to this prohibition. *Id.* § 1133(d). This statutory structure, with prohibitions including an express bar on commercial enterprise within wilderness, limited by specific and express exceptions, shows a clear congressional intent generally to enforce the prohibition against "commercial enterprise" when the specified exceptions are not present. *See United States v. Smith*, 499 U.S. 160, 167, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.") (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17, 100 S.Ct. 1905, 64 L.Ed.2d 548 (1980)); *Far West Fed. Bank, S.B. v. Director, Office of Thrift Supervision*, 951 F.2d 1093, 1097 (9th Cir.1991) ("[W]hen Congress explicitly enumerates exceptions to a general scheme, exceptions not explicitly made should not be implied, absent evidence of contrary legislative intent."). There is no exception given for commercial enterprise in wilderness when it has benign purpose and minimally intrusive impact.

The language, purpose and structure of the Wilderness Act support the conclusion that Congress spoke clearly to preclude commercial enterprise in the designated wilderness, regardless of the form of commercial activity, and regardless of whether it is aimed at assisting the economy with minimal intrusion on wilderness values.

## C

Because the aim of Congress in the Wilderness Act to prohibit commercial enterprise within designated wilderness is clear, we do not owe deference to the USFWS's determination regarding the permissibility of the Enhancement Project if it is a commercial enterprise. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778.

The district court grounded its decision in part on an assessment that the impact on wilderness of millions of fry unseen beneath the waters of Bear Creek and Tustumena Lake was not terribly intrusive on wilderness values and that the project would hardly be noticed by those visiting the wilderness. The district court also was impressed that the CIAA was a non-profit entity, that the State of Alaska heavily regulated the Enhancement Project, and that commercial effects of the project generally occurred years after the collection of salmon eggs and later release of the fry and were realized by commercial fishermen who sought their catch outside the wilderness bounds.

We thus deal with an activity with a benign aim to enhance the catch of fishermen, with little visible detriment to wilderness, under the cooperative banner of a non-profit trade association and state regulators. Surely this fish-stocking program, whose antecedents were a state run research project, is nothing like building a McDonald's restaurant or a Wal–Mart store on the shores of Tustumena Lake. Nor is it like conducting a commercial fishing operation within designated wilderness, which we have previously proscribed. *See Alaska Wildlife Alliance v. Jensen*, 108 F.3d 1065, 1069 (9th Cir.1997). Nor is the project like cutting timber, extracting minerals, or otherwise exploiting wilderness resources in a way that is plainly destructive of their preservation.

Conversely, the challenged activities do not appear to be aimed at furthering the

goals of the Wilderness Act. The project is not aimed at preserving a threatened salmon run.[7] Looked at most favorably, for the proponents of the fish-stocking project, it might be concluded that the project only negligibly alters the wild character of Tustumena Lake and is not incompatible with refuge values, though those issues are disputed.[8] And it might also be considered that, to the extent the project is a servant of commerce, it may pose a threat to the wild, even if it operates under the eye of state and federal regulators.

Before further addressing the reasoning of the district court, we acknowledge that none of our precedent, and no explicit guidance from the United States Supreme Court, has addressed how to assess "commercial enterprise" when faced with activities involving mixed purposes and effects. The lack of explicit guidance on this issue in part led the district court to defer to the agency action. Yet we have determined that Congress absolutely proscribed commercial enterprise in the wilderness, and it is a traditional judicial function to apply that prohibition to the precise facts here, to determine if the challenged project may continue consistent with the will of Congress.

■ In light of Congress's language and manifest intent, we conclude that the most sensible rule of decision to resolve whether an activity within designated wilderness bounds should be characterized as a "commercial enterprise" turns on an assessment of the purpose and effect of the activity. See Sierra Club v. Lyng, 662 F.Supp. 40, 42–43 (D.D.C.1987); see also Jensen, 108 F.3d at 1069 (9th Cir.1997). Lyng, though it involves a different issue under the Wilderness Act, is instructive on the issue of whether the Enhancement Project should be considered a commercial enterprise. In Lyng, plaintiffs challenged the legality of a United States Forest Service program to control pine beetle infestations in designated wilderness areas by an extensive tree-cutting and chemical-spraying campaign. Defendant urged that the eradication program was permissible, without justification, under section 4(d)(1) of the Wilderness Act, 16 U.S.C. § 1133(d)(1), under which the Secretary of Agriculture may take "such measures . . . as may be necessary in the control of fire, insects, and diseases," within the designated wilderness. Rejecting this contention, the district court stressed that the "purpose and effect of the program [was] solely to protect commercial timber interests and private property," and imposed an affirmative burden on the Secretary of Agriculture to justify the eradication program in light of wilderness values. Lyng, 662 F.Supp. at 42–43.[9]

---

7. In describing the present Enhancement Project, the Kenai Refuge Manager has stated: "The activity is no longer experimental in nature, nor is restoration of fish stocks an objective. It is strictly an enhancement effort to increase the number of sockeye salmon available to the commercial fishery." This declaration occurs as part of a broader statement about the primary purpose of the project to enhance the commercial catch of sockeye salmon. See infra 1065.

8. In footnote 18 we decline to reach the issues of whether the challenged project alters "natural conditions" that are part of the "wilderness character" to be preserved by the Wilderness Act and whether it is "compatible" with purposes of the Kenai Refuge.

9. The USFWS contends that Lyng is not persuasive authority because the district court later found a scaled-back version of the eradication program permissible under the Wilderness Act. Sierra Club v. Lyng, 663 F.Supp. 556, 557, 560–61 (D.D.C.1987). However, this subsequent holding does not undercut the stress the Lyng court placed on consideration of purpose and effect. The district court only later approved the eradication program upon the Secretary of Agriculture's showing that the scaled-back program's primary purpose and effect was to protect wilderness re-

**1064**

The consideration of purpose and effect of challenged actions not infrequently assists in determining whether a prohibition is to be applied to complex conduct. For example, the United States Supreme Court has long looked to the purpose and effect of state action to determine whether it violates the Establishment Clause. *E.g.,* *Agostini v. Felton,* 521 U.S. 203, 218, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Mayweathers v. Newland,* 314 F.3d 1062, 1068 (9th Cir.2002). It is also commonplace to assess purpose and effect to determine whether a trade restraint is unreasonable. *E.g., Bd. of Trade, Chicago v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918); *Paladin Assocs. v. Mont. Power Co.,* 328 F.3d 1145, 1156 & n. 9 (9th Cir.2003). Similarly, the Supreme Court has directed us to rely on considerations of purpose and effect in determining whether there is a conflict between state and federal law that leads to preemption of the state law. *E.g. Gade v. Nat'l Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 106–07, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992); *Oxygenated Fuels Ass'n v. Davis,* 331 F.3d 665, 672 (9th Cir.2003). The Supreme Court has also focused our review on purpose and effect in evaluating whether a statute is properly characterized as civil or criminal. *E.g., Hudson v. United States,* 522 U.S. 93, 99, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997); *Rivera v. Pugh,* 194 F.3d 1064, 1068 (9th Cir.1999).

The importance of considering purpose and effect to judge the legality of challenged action is also a recurring theme in statutory law. Section five of the Voting Rights Act requires that a covered jurisdiction seeking preclearance of a proposed change to voting qualifications, prerequisites, standards, practices, or procedures demonstrate that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c; *see Reno v. Bossier Parish Sch. Bd.,* 528 U.S. 320, 328, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000). And copyright law prohibits the import, manufacture or distribution of devices or services with the primary purpose or effect of circumventing controls on the reproduction of copyrighted works. 17 U.S.C. § 1002(c).

For all these reasons, we conclude that as a general rule both the purpose and the effect of challenged activities must be carefully assessed in deciding whether a project is a "commercial enterprise" within the wilderness that is prohibited by the Wilderness Act. Thus we will give great weight to an assessment of purpose and effect in deciding whether the Enhancement Project is a proscribed commercial enterprise within the Kenai Wilderness. This familiar test looking to "purpose and effect" is persuasive here because it gets to the heart of what has occurred in the wilderness.

■■■ The primary purpose of the Enhancement Project is to advance commercial interests of Cook Inlet fishermen by swelling the salmon runs from which they will eventually make their catch. The Enhancement Project is operated by an organization primarily funded by a voluntary self-imposed tax instituted by the Cook Inlet fishing industry on the value of its salmon catch. In the words of the Kenai Refuge Manager, in a memorandum to the Department of Interior's Regional Solicitor:

sources, not commercial interests, *id.* at 558, and that the program was "necessary to effectively control the threatened outside harm" to designated wilderness. *Id.* at 559. Thus the

second *Lyng* decision equally supports the important role of purpose and effect in our analysis of the Enhancement Project.

The *primary purpose of the enhancement activity is to supplement sockeye catches* for East Side Cook Inlet set-net commercial fishermen, and for lower Cook Inlet enhancement projects.

A secondary purpose is use of the excess eggs taken from Tustumena in a CIAA cost recovery project to help finance the Tustumena lake and lower Cook Inlet sockeye salmon enhancement projects.

*The activity is no longer experimental in nature, nor is restoration of fish stocks an objective. It is strictly an enhancement effort to increase the number of sockeye salmon available to the commercial fishery.*

Memorandum from Kenai Refuge Manager to Regional Solicitor 2–3 (undated), ER 224–26 (emphasis added). The Fishery Management Plan for the Kenai Refuge characterizes the purpose of the Enhancement Project as "commercial enhancement of sockeye salmon populations in ... Tustumena lake[ ]." This primary purpose is not contradicted by evidence that the Enhancement Project serves other secondary noncommercial purposes, including providing a general benefit to the fishery commonly used by commercial and recreational fishermen alike. Incidental purposes do not contradict that the Enhancement Project's principal aim is stock enhancement for the commercial fishing industry.[10]

The primary effect of the Enhancement Project is to aid commercial enterprise of fishermen. More than eighty percent of the salmon produced by the Enhancement Project are caught by commercial fishermen, who realize over $1.5 million in additional annual revenue from project-produced fish. USFWS documents highlight the primary effect of the Enhancement Project to aid commercial enterprise. For example, the July 1997 EA states that "[i]t is apparent because commercial fishing economics is emphasized ... the main reason for continuing the project is economic[ ] in nature." Similarly a USFWS "Briefing Statement" concludes that "[w]e should consider [CIAA's cost-recovery harvest] to be a commercial fishing operation." The 1997 Compatibility Determination concludes that the Enhancement Project "primarily benefits Eastside Cook Inlet set-net commercial fishermen." In light of this primary effect, any incidental benefit to sport fishermen or others is not controlling. The incidental benefit that the program may provide to recreational and sport fishermen is subordinate to the primary benefit conferred on the commercial fishing industry.

In light of the unmistakable primary purpose and effect of the Enhancement Project, we reject arguments advanced by the USFWS that were credited by the district court.[11] The district court reasoned in part that the CIAA is itself a nonprofit organization. But the non-profit status of the CIAA cannot be controlling because its non-profit activities are funded by the fishing industry and are aimed at providing benefits to that industry. The CIAA's continued funding and operation is dependent upon the revenues of commercial fishermen, and we have previously recognized that even non-profit entities may engage in commercial activity. *Dedication*

---

10. USFWS's own definition of "commercial enhancement," as set forth in the Kenai Refuge Fishery Management Plan, confirms this conclusion. According to this definition, although commercial enhancement "is primarily directed toward maintaining commercial fisheries," "[s]ome sport and subsistence harvest of the enhanced fish may occur."

11. The district court did not give the same weight to considerations of purpose and effect as we do here. That is perhaps because, as above indicated, our prior precedent has not given guidance on this issue.

*and Everlasting Love to Animals v. Humane Soc.,* 50 F.3d 710, 713(9th Cir.1995) ("A nonprofit organization . . . may engage in commercial activity.").[12]

In addition, the district court relied on the involvement of the State of Alaska, which previously had run the stocking project to research the viability of artificially enhancing salmon runs. But prior management activity and present regulatory control by the State of Alaska is irrelevant to assessing the primary purpose and effect of the current Enhancement Project. When the State had direct control of operations, the project's primary purpose was research-oriented. As set forth in the 1985 Memorandum of Understanding, the project was aimed at researching the viability of techniques to enhance the salmon run and evaluating the side effects of stocking, including its effect on lake-reared fish, escapement levels, and the incidence of disease in the salmon population. But now the project, as run by the CIAA, is aimed at enhancing salmon runs to increase the catch of commercial fishermen. The purpose of the project has changed from research on techniques to practical operations to swell the catch of fish and the commerce thereon. That the State maintains regulatory control over the Enhancement Project, by its permitting authority over the CIAA's hatchery operations, *see* Alaska Stat. §§ 16.10.380, 16.10.400(a) (2003), does not matter. The State regulates an array of commercial enterprises, from cruise ship operation to oil exploration. *See, e.g.,* Alaska Stat. §§ 31.05.090, 46.03.460 *et seq.* (2003). That an industry or activity is regulated does not mean that it is no longer a commercial activity.

Furthermore, the essential nature of the Enhancement Project is not changed merely because the commercial benefit derived from the Enhancement Project is conferred when fishermen make their salmon catch outside the bounds of the Kenai Wilderness. It is correct that what the Wilderness Act bars is the operation of a "commercial enterprise . . . *within* any wilderness area." 16 U.S.C. § 1133(c) (emphasis added). But it is not disputed that substantial and essential parts of the Enhancement Project's operation, the collection of eggs taken to a hatchery and the stocking of six million fry returned to Bear Creek, occur within the Kenai Wilderness.[13]

Implicit in the justifications urged for the project is the premise that we may recognize that the benign purposes of the project should be permitted to continue

---

12. The CIAA itself, to some extent, engages in commercial activity through its cost-recovery sale of the excess salmon produced each year by the Enhancement Project, from which it realizes nearly one million dollars in annual revenue. *See Goldfarb v. Virginia State Bar,* 421 U.S. 773, 787–88, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) ("[T]he exchange of . . . a service for money is 'commerce' in the most common usage of that word."). We need not stress this factor, for in light of the primary purpose and effect to benefit the commercial activities of fishermen, our conclusion that a commercial enterprise prohibited within wilderness has been shown would remain the same even if the CIAA discarded without sale all fry supplementary to the stocking program.

13. If we were to accept the argument that the Enhancement Project, despite its commercial aims, is exempt from the Wilderness Act because the project's commercial benefit is conferred outside the wilderness, we would likely soon face arguments that other commercial operations, more intrusive on the wilderness, might be sustained under the Wilderness Act, if transactions constituting commerce occur outside of the wilderness area's bounds. The weakness in this line of argument is obvious if we consider that a logging operation within the wilderness could not sensibly be urged to be permissible, even though the trees harvested were sold outside of the wilderness area.

because the Wilderness Act resulted from a "compromise" of the legislature.[14] But regardless of any tradeoffs considered by Congress in enacting the Wilderness Act, we interpret and apply the language chosen by Congress, for that language was chosen in order to incorporate and effectuate those tradeoffs. The plain language of the Wilderness Act states that there shall be "*no* commercial enterprise" within designated wilderness. 16 U.S.C. § 1133(c) (emphasis added). This mandatory language does not provide exception to the prohibition on commercial enterprise within wilderness if aimed at achieving a benign goal for commerce with modest impact on wilderness. That compromises may have been made in the legislative process does not alter an analysis of Congress's words of proscription based on traditional canons of statutory construction. *See American Ass'n of Retired Persons v. E.E.O.C.*, 823 F.2d 600, 604 (D.C.Cir.1987) ("[S]tatutes are records of legislative compromise, and the best guide to the purposes of a statute is the language of the statute itself.").

We must abide by Congress's prohibition of commercial enterprise in wilderness and may not defer to the contrary interpretation argued by the USFWS. In light of the clear statutory mandate, the Wilderness Act requires that the lands and waters duly designated as wilderness must be left untouched, untrammeled, and unaltered by commerce. By contrast, the Enhancement Project is a commercial enterprise within the boundaries of a designated wilderness and violates the Wilderness Act.

### III

■■■ As an alternative holding in support of our decision, even if we were to assume that the Wilderness Act's prohibition on commercial enterprise within the wilderness is ambiguous, we would reach the same conclusion that the Enhancement Project offends the Wilderness Act. Assuming ambiguity in the scope of the prohibition, under *Mead* agency action is not entitled to heightened *Chevron* deference unless the agency can demonstrate that it has the general power to "make rules carrying the force of law" and that the challenged action was taken "in the exercise of that authority." *Mead*, 533 U.S. at 226–27, 121 S.Ct. 2164. Administrative interpretations not meeting these standards are entitled not to deference, but to a lesser "respect" based on the persuasiveness of the agency decision. *Id.* at 228, 121 S.Ct. 2164; *Skidmore*, 323 U.S. at 139–40, 65 S.Ct. 161.

Applying *Mead*, we conclude that this case involves only an agency's application of law in a particular permitting context, and not an interpretation of a statute that will have the force of law generally for others in similar circumstances. The issuance of a permit by a federal agency cannot in this case be characterized as the exercise of a congressionally delegated legislative function. *Mead*, 533 U.S. at 229–30, 121 S.Ct. 2164. Even when considered together, the Special Use Permit and the underlying documents supporting it do not "bespeak the legislative type of activity that would naturally bind more than the parties to the ruling." *Id.* at 232, 121 S.Ct. 2164.

Pursuant to the NEPA process, the USFWS issued several documents before granting the CIAA a Refuge Special Use Permit for the Enhancement Project. These documents included the EA, a Mitigated Finding of No Significant Impact, a Wilderness Act Consistency Review, and a

14. The Regional Solicitor's opinion on which USFWS relied urges that "[the Wilderness Act] is a legislative compromise that by no means reflects pure or absolute preservationism."

Compatibility Determination. Only the Consistency Review and Compatibility Determination contain legal analysis of the Wilderness Act. Both the Consistency Review and the Compatibility Determination speak in terms specific to the Enhancement Project, and do not address general principles of law.[15] The analysis that these documents give to the permissibility of the Enhancement Project relies on an opinion letter prepared by the Department of the Interior's Regional Solicitor's office. Entitled "Kenai National Wildlife Refuge; Tustumena Lake Enhancement Project," this opinion letter speaks only to the permissibility of the CIAA-operated Enhancement Project in Tustumena Lake, and does not attempt to draw broader conclusions regarding the permissibility of this type of enterprise within wilderness. Nothing in the review documents or the Solicitor's opinion would bind the USFWS to permit a similar activity in another wilderness.

■ We recently stated in the context of the National Marine Fisheries Service's interpretation of the High Seas Compliance Act, 16 U.S.C. § 5501–5509, that "[i]nterpretations such as those in opinion letters ... do not warrant *Chevron*-style deference." *Turtle Island Restoration Network v. Nat'l Marine Fisheries Ser-*

*vice,* 340 F.3d 969, 975 n. 10 (9th Cir.2003) (quoting *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000)).[16] The Solicitor's opinion relied upon by the USFWS in issuing the Special Use Permit to CIAA was not a document intended to have the general force of law. *See* generally Robert A. Anthony, *Which Agency Interpretations Should Bind Citizens and the Courts?,* 7 Yale J. on Reg. 1, 58 (1990) (surveying the landscape of deference to agency action and concluding that "[i]nterpretations presented in [opinion letters] do[ ] not have the force of law"). Neither can the project-specific documents that rely upon this opinion be considered to carry the general force of law.

■ Under *Mead* and *Skidmore,* the weight that we are to give an administrative interpretation not intended by an agency to carry the general force of law is a function of that interpretation's thoroughness, rational validity, and consistency with prior and subsequent pronouncements. *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161. *Mead* adds as other relevant factors the "logic[ ] and expertness" of an agency decision, the care used in reaching the decision, as well as the formality of the process used. *Mead,* 533 U.S. at 228, 235,

---

15. In answering the question of whether fishery enhancement is an appropriate activity in the designated wilderness, the Consistency Review quotes an opinion of the Department of the Interior Regional Solicitor's office concluding that the "[USFWS] has administrative discretion sufficient to grant [CIAA] a special use permit for operation of a compatible enhancement project in the Kenai Wilderness." The Consistency Review relies on the same Solicitor's opinion, and concludes that "the proposed action is consistent with the legal requirements of the Wilderness Act and ANILCA." These conclusions are inconsistent with a view that the USFWS intended the analyses in these documents to have legal force beyond determination of the permissibility of this Enhancement Project.

16. There has been judicial suggestion that Solicitor's opinions specifically are not entitled to *Chevron* deference. *Manning v. United States,* 146 F.3d 808, 814 n. 4 (10th Cir.1998) (addressing a Department of the Interior Solicitor's opinion regarding the Multiple Use Mining Act of 1955). In terms of the principles set forth in *Chevron* and *Mead,* we likewise conclude that Solicitor's opinions, helpful as they may be to agencies which study them, cannot properly be viewed as an administrative agency interpretation of statute that has the force of law. Such opinions, which normally are the product of individual lawyers advising their client agencies, and which do not in their formulation involve procedural protections comparable to an agency's rulemaking procedures, do not invoke *Chevron* deference.

121 S.Ct. 2164. Even if we assume the Wilderness Act's prohibition on commercial enterprise to be ambiguous, the USFWS's permitting of the Enhancement Project "goes beyond the limits of what is ambiguous and contradicts what in our view is quite clear." *Whitman v. Am. Trucking Ass'n,* 531 U.S. 457, 481, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). Whatever else might be done permissibly within wilderness in extraordinary circumstances for purposes relating to conservation or preservation of the wilderness, we conclude that it is "quite clear" that conduct with the primary purpose and effect to aid commercial enterprise cannot be countenanced.

Moreover, the USFWS's decision-making process shows little attention to the precise question of whether the Enhancement Project is a commercial enterprise. Although the USFWS argues that the Regional Solicitor was specifically asked if the project was a precluded commercial enterprise, the issue of commercial enterprise was not addressed explicitly by the Solicitor's opinion upon which the USFWS relied; the Solicitor's opinion cannot be considered persuasive on interpretation of a statutory term that it does not discuss with specificity.[17] And the record before the agency in our view supports a conclusion squarely contrary to that reached by the USFWS.

■ The final USFWS decision that the Enhancement Project is not a commercial enterprise contains little analysis of the commercial enterprise issue. Relying on the Regional Solicitor's opinion, the Wilderness Act Consistency Review devotes only a few sentences to the question of whether the Enhancement Project is a commercial enterprise, concluding that close state regulation of the project obviates the commercial enterprise issue. We have concluded to the contrary that state regulation does not preclude characterizing as a commercial enterprise an activity with the primary purpose and effect to benefit commerce. The USFWS analysis on consistency was not thorough, *see Skidmore,* 323 U.S. at 140, 65 S.Ct. 161, and we are not impressed by "persuasiveness of the agency's position." *See Mead,* 533 U.S. at 228, 121 S.Ct. 2164. We do not consider the USFWS decision to have significant "rational validity," *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161, or to reflect the product of specialized agency expertise. *Mead,* 533 U.S. at 228, 235, 121 S.Ct. 2164.

Having considered the *Mead* and *Skidmore* factors, we are not persuaded by the agency's analysis. We hold, alternatively, that even if the term "commercial enterprise" within designated wilderness is ambiguous, the Enhancement Project under the total circumstances is a prohibited commercial enterprise within wilderness.[18]

17. On the day before the USFWS's issuance of the Special Use Permit, the Regional Solicitor issued a second letter giving further consideration to the issues addressed in the initial opinion letter. This second letter concludes that § 1315(b) of ANILCA does not prohibit fishery enhancement projects in Alaskan refuge wilderness areas. ANILCA § 1315(b) permits fishery enhancement "[i]n accordance with the goal of restoring and maintaining fish production in the State of Alaska." *Id.* However, this letter gives no express consideration to the Wilderness Act's specific prohibition on commercial enterprise within a designated wilderness. As such it is not helpful or persuasive in interpreting the Wilderness Act.

18. Plaintiffs also assert that the Enhancement Project violates the Wilderness Act's requirement that any action taken within a federally-designated wilderness area preserve the "natural conditions" that are a part of the "wilderness character" of such an area, 16 U.S.C. §§ 1131, 1133, and also that the project violates the Refuge Act's mandate that special use permits be issued only after a determination that "such uses are compatible with the major purposes for which such areas were established." 16 U.S.C. § 668dd(d)(1)(A).

## IV

Plaintiffs were entitled to prevail on their motion for summary judgment establishing that the USFWS's permit for the commercial enhancement program violated the Wilderness Act. Plaintiffs were entitled to gain a final judgment setting aside the USFWS's permit. Plaintiffs were entitled to gain a final judgment enjoining operation of the Tustumena Lake Sockeye Salmon Enhancement Project.

**REVERSED** and **REMANDED** for further proceedings not inconsistent with this opinion. Costs shall be borne by Defendant.[19]

See also 353 F.3d 1093, 2003 WL 23095734.

Because we have determined that the district court erred in granting summary judgment to the USFWS, because the Enhancement Project is a prohibited commercial enterprise, we need not and do not consider these additional claims.

19. Plaintiff Wilderness Society has requested an award of reasonable attorney's fees under the Equal Access to Justice Act. We do not reach this issue. Plaintiffs may file a motion seeking such an award of fees, to be addressed after defendant has had an opportunity to be heard.