**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STEFAN SCHNEIDER; ANWAR
TANDAR; KOMSU MAMUYA;
MUHAMMAD AIJAZ SATTAR; SANDEEP
HARBANS JAIN; MAHESH
KRISHNAMOORTHY; SARAVANAN
KASTHURI; BOGDAN NEDELESCU,
            *Plaintiffs-Appellants,*          No. 04-55689

                    v.                         D.C. No.
                                            CV-02-09228-DSF
MICHAEL CHERTOFF,* Secretary of
Homeland Security; EDUARDO                     OPINION
AGUIRRE, JR., Acting Director of
the Bureau of Citizenship and
Immigration Services; BUREAU OF
CITIZENSHIP AND IMMIGRATION
SERVICES,
            *Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted
December 5, 2005—Pasadena, California

Filed June 7, 2006

Before: Harry Pregerson, John T. Noonan, and
Sidney R. Thomas, Circuit Judges.

*Michael Chertoff is substituted for his predecessor, Thomas J. Ridge, as Secretary of Homeland Security of the United States, pursuant to Fed. R. App. P. 43(c)(2).

6179

Opinion by Judge Pregerson

**COUNSEL**

Carl Shusterman, Los Angeles, California, for the plaintiffs.

Joanne S. Osinoff, Asst. U.S. Attorney, Los Angeles, California, for the defendants.

Trina A. Realmuto (briefed), Washington, D.C., for the American Immigration Law Foundation.

**OPINION**

PREGERSON, Circuit Judge:

Plaintiffs-Appellants Stefan Schneider, Anwar Tandar, Komsu Mamuya, and Saravanan Kasthuri ("Immigrant Doctors") are medical doctors who practice in designated medical shortage areas. The Immigrant Doctors seek adjustment to lawful permanent resident ("LPR") status based on their employment. The Immigrant Doctors brought an action against the Secretary of Homeland Security ("Secretary") in federal district court for declaratory and injunctive relief, challenging the validity of several regulations that implement the Nursing Relief for Disadvantaged Areas Act of 1999 ("Nursing Relief Act"), Pub. L. No. 106-95, 113 Stat. 1312 (Nov. 12, 1999) (codified at 8 U.S.C. § 1153(b)(2)(B)(ii)). The district court denied the Immigrant Doctors' motion for summary judgment and dismissed the action. The Immigrant Doctors filed this timely appeal. For the reasons set forth below, we affirm the district court in part and reverse in part.

## I. STATUTORY FRAMEWORK

At issue in this case is the national interest waiver that provides an accelerated path to LPR status for immigrant doctors who practice in medically underserved areas. Absent a national interest waiver, an immigrant doctor generally follows a three-step path to LPR status. First, the immigrant doctor obtains a job offer from a United States employer, *see* 8 U.S.C. § 1153(b)(2), and the employer applies for labor certification of the job offer from the Department of Labor, *see* 8 U.S.C. § 1182(a)(5)(A)(i).[1] Second, once the Department of Labor has certified the job offer, the employer files a Form I-

---

[1] To obtain labor certification, the employer must show (1) that there are insufficient U.S. workers to fill the job, and (2) that the immigrant doctor's employment will not adversely affect the wages and working conditions of U.S. workers. *See id.*

140, Immigrant Petition for Alien Worker ("immigrant visa petition") on the immigrant doctor's behalf. *See* 8 U.S.C. § 1154(a)(1)(F). Third, the immigrant doctor applies for adjustment to LPR status based on the approved immigrant visa petition. *See* 8 U.S.C. § 1255(a).

Applicants may avoid the first step of the process by obtaining a national interest waiver. *See* 8 U.S.C. § 1153(b)(2)(B). Congress first created the national interest waiver program in the Immigration Act of 1990, Pub. L. No. 101-649, § 121(a), 104 Stat. 4978 (Nov. 29, 1990) (codified at 8 U.S.C. § 1153(b)(2)(B)(i)), and significantly expanded the national interest waiver program in 1999 with the Nursing Relief Act. Although this case focuses on the national interest waiver program created by the Nursing Relief Act, we first discuss the 1990 national interest waiver for background purposes.

The 1990 national interest waiver program gave the Attorney General discretion to waive the job offer requirement for immigrants whose services to a United States employer would be "in the national interest." 8 U.S.C. § 1153(b)(2)(B)(i). That purely discretionary waiver allowed an alien to skip the first step, the labor certification, and advance directly to the second step, the immigrant visa petition. As a practical matter, an alien who skips the labor certification process will become an LPR long before an alien who must comply with the labor certification requirement. *See Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 110-13 (D.D.C. 2005) (discussing Department of Labor "backlog centers" for labor certification applications and noting that labor certification applications filed by twelve aliens in that action had been pending without action for two to four years). The discretionary national interest waiver continues to exist today in the same form it was created in 1990. *See* 8 U.S.C. § 1153(b)(2)(B)(i).

In 1999, in response to a nationwide shortage of nurses and doctors, Congress passed the Nursing Relief Act. The Nursing

Relief Act created a new non-immigrant visa classification for nurses who came temporarily to the United States to work. *See* 8 U.S.C. § 1101(a)(15)(H)(i)(c). It also created a *non-discretionary* national interest waiver of the labor certification requirement for doctors who agreed to work in federally-designated health professional shortage areas. *See* 8 U.S.C. § 1153(b)(2)(B)(ii). A doctor would be eligible for the new national interest waiver if the doctor agreed to work full time as a physician in an area that had been designated as a health professional shortage area by the Secretary of Health and Human Services. *See* 8 U.S.C. § 1153(b)(2)(B)(ii)(I)(aa). Congress specified, however, that the doctor could not receive LPR status "until such time as the alien has worked full time as a physician for an aggregate of 5 years" in a shortage area, *see* 8 U.S.C. § 1153(b)(2)(B)(ii)(II), or an aggregate of 3 years in a shortage area if the doctor had applied for a discretionary national interest waiver before November 1, 1998, *see* 8 U.S.C. § 1153(b)(2)(B)(ii)(IV).[2]

## II.  IMPLEMENTING REGULATIONS

On September 6, 2000, the Secretary[3] promulgated an

---

[2]While the national interest waiver created by the Nursing Relief Act is operatively identical to the national interest waiver created in 1990, the waivers differ in two important respects. First, the 1990 national interest waiver was discretionary, whereas the Nursing Relief Act waiver is mandatory. *Compare* 8 U.S.C. § 1153(b)(2)(B)(i) (stating that "the Attorney General *may*, when the Attorney General deems it to be in the national interest, waive" the labor certification requirement) (emphasis added), *with* 8 U.S.C. § 1153(b)(2)(B)(ii)(I) (stating that "[t]he Attorney General *shall* grant a national interest waiver" of the labor certification requirement) (emphasis added). Second, the 1990 national interest waiver simply waived the labor certification requirement, without imposing any requirement that the alien engage in the qualifying employment for a term of years. *See* 8 U.S.C. § 1153(b)(2)(B)(i). By contrast, the Nursing Relief Act restricts national interest waiver recipients from obtaining LPR status until they have practiced medicine in shortage areas for three or five years. *See* 8 U.S.C. § 1153(b)(2)(B)(ii)(II), (IV).

[3]The Attorney General actually promulgated this interim rule. At the time, the Attorney General was charged with the administration and

interim rule that created two regulations to implement the Nursing Relief Act.[4] *See generally* National Interest Waivers for Second Preference Employment-Based Immigrant Physicians Serving in Medically Underserved Areas or at Department of Veterans Affairs Facilities, 65 Fed. Reg. 53,889 (Sept. 6, 2000) (codified at 8 C.F.R. §§ 204.12, 245.18).

The Immigrant Doctors challenge five sections of the regulations in this action. First, they challenge the rule that an immigrant doctor's qualifying practice in a shortage area does not commence until the date of the notice approving the immigrant visa petition and national interest waiver request. *See* 8 C.F.R. § 245.18(e). Second, they challenge the requirement that an immigrant doctor who applied for a national interest waiver before November 1, 1998 practice medicine in a shortage area for five years if the initial application was denied before November 12, 1999. *See* 8 C.F.R. § 204.12(d)(4), (6). Third, they challenge the imposition of a

enforcement of the Immigration and Nationality Act ("INA"), and possessed the regulatory power thereunder. *See* 8 U.S.C. § 1103(a)(1), (3) (2000). Congress later transferred that power to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 1102(2)(A), 116 Stat. 2135 (2002), *as amended by* Pub. L. No. 108-7, § 105(a)(1), 117 Stat. 11, 531. We will refer to the Secretary, instead of the Attorney General, throughout this opinion.

[4]We note that the Secretary implemented the interim rule immediately without prior notice and comment, citing the good cause exception at 5 U.S.C. § 553(b)(B) and (d)(3). *See* 65 Fed. Reg. 53,889, 53,892 (Sept. 6, 2000). Specifically, the Secretary recognized the immediate public health need to bring physicians to underserved areas without further regulatory delay. *See id.* The Secretary sought public comment and noted that he would "address those comments prior to the implementation of the final rule." *Id.* Though we do not doubt the necessity of immediate implementation of the rule, we are concerned that the Secretary has neither addressed the public comments nor finalized the rule in the more than five years since its promulgation. Indeed, apart from minor editorial corrections to the interim rule, *see* 65 Fed. Reg. 57,943 (Sept. 27, 2000); 65 Fed. Reg. 57,861 (Sept. 26, 2000), the Secretary has left the interim rule untouched.

strictly limited time period during which time the immigrant doctor must complete the qualifying practice. *See* 8 C.F.R. § 204.12(b), (d)(4); 65 Fed. Reg. 53,889, 53,890 (Sept. 6, 2000). If the doctor fails to complete the qualifying practice in the allotted time, the doctor's immigrant visa petition will be revoked and his application for LPR status will be denied. *See id.* Fourth, they challenge the limitation of eligibility for a national interest waiver to doctors who practice a medical specialty that falls within the Secretary of Health and Human Services' shortage designation for the particular area. *See* 8 C.F.R. § 204.12(a)(2). Fifth, they challenge the requirement that an immigrant doctor make multiple submissions to confirm compliance with the medical practice requirement before the doctor can obtain LPR status. *See* 8 C.F.R. § 245.18(g), (h).

## III.   FACTUAL AND PROCEDURAL HISTORY

The Immigrant Doctors are all medical doctors licensed to practice medicine in their respective jurisdictions in the United States. The doctors seek to adjust to LPR status based on second preference employment-based immigrant visa petitions filed by their employers in conjunction with national interest waiver requests. Though the Immigrant Doctors' original complaint named eight doctor plaintiffs when it was filed in 2002, four doctors have since obtained LPR status, rendering their claims moot.[5] *See Tongatapu Woodcraft Hawaii, Ltd. v. Feldman*, 736 F.2d 1305, 1307-08 (9th Cir. 1984) (holding moot appeal from revocation of visa petition where immigrant subsequently obtained LPR status).

---

[5]These four are Doctors Muhammad Aijaz Sattar, Sandeep Harbans Jain, Mahesh Krishnamoorthy, and Bogdan Nedelescu.

### A.   Plaintiffs

#### 1.   Dr. Stefan Schneider

Dr. Stefan Schneider is a native and citizen of Germany. Dr. Schneider came to the United States in April 1992 in lawful J-1 non-immigrant status.[6] On June 29, 1998, Dr. Schneider obtained a change of non-immigrant status from J-1 to O-1 status. On September 1, 1998, Dr. Schneider began working as an infectious disease specialist for Pro Health, Inc. at two AIDS clinics in California, both of which are in designated shortage areas. Dr. Schneider continues to work for Pro Health, Inc.

On March 6, 2003, Pro Health filed an immigrant visa petition and national interest waiver request on Dr. Schneider's behalf with the Department of Homeland Security ("DHS").[7] On June 26, 2003, the DHS approved the immigrant visa petition and national interest waiver request. On August 25, 2003, Dr. Schneider applied for adjustment to LPR status. Dr. Schneider's application for adjustment of status is pending.

#### 2.   Dr. Anwar Tandar

Dr. Anwar Tandar is a native and citizen of Indonesia. Dr. Tandar entered the United States in July 1997 in valid non-immigrant status. Dr. Tandar worked for the Fallon Clinic's

---

[6]Although we need not examine the particulars of the various non-immigrant visas, the fact that Dr. Schneider initially had J-1 status is significant. The Nursing Relief Act explicitly provides that medical practice engaged in while in J-1 non-immigrant status does *not* count towards the aggregate three-year or five-year medical practice requirement. *See* 8 U.S.C. § 1153(b)(2)(B)(ii)(II), (IV).

[7]The Immigration and Naturalization Service has been abolished and its functions transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 471, 116 Stat. 2135, 2205 (2002), 6 U.S.C. § 291. We will refer to the government agency as the DHS.

Saint Vincent Hospital in Worcester, Massachusetts, a designated shortage area, from August 1997 to June 2003. It is unclear from the record where Dr. Tandar is currently working.

On June 1, 1998, the Fallon Clinic filed an immigrant visa petition and national interest waiver request on Dr. Tandar's behalf with the DHS.[8] On June 21, 1999, DHS denied both the immigrant visa petition and the national interest waiver request, finding that Dr. Tandar had "not established that a waiver . . . will be in the national interest of the United States." On November 17, 2000, DHS denied Dr. Tandar's request to reopen or reconsider the denial. On January 12, 2001, the Fallon Clinic filed a new immigrant visa petition and national interest waiver request on Dr. Tandar's behalf under the Nursing Relief Act. The DHS approved the immigrant visa petition and national interest waiver request on September 11, 2001. Dr. Tandar applied for adjustment to LPR status on November 13, 2001. That application is currently pending.

### 3.  Dr. Komsu Mamuya

Dr. Komsu Mamuya is a native and citizen of Tanzania. Dr. Mamuya entered the United States in August 1987 as a student in valid F-1 non-immigrant status. Dr. Mamuya changed from student to temporary worker status in 1996 to work for Beth Israel Hospital in Boston, Massachusetts. In July 1999, Dr. Mamuya left Beth Israel and began working for the Fallon Clinic in a federally-designated shortage area.

On March 26, 2001, the Fallon Clinic filed an immigrant visa petition and national interest waiver request on Dr. Mamuya's behalf with the DHS. The DHS approved the

---

[8]Dr. Tandar's first application for a national interest waiver was filed before the Nursing Relief Act, when the Attorney General could, in her discretion, confer the waiver if she found it to be in the national interest.

immigrant visa petition and national interest waiver request on September 11, 2001. Dr. Mamuya applied for adjustment to LPR status on November 28, 2001. That application is currently pending.

### 4.  Dr. Saravanan Kasthuri

Dr. Saravanan Kasthuri is a native and citizen of India. Dr. Kasthuri, a radiologist, entered the United States in June 1995 in lawful J-1 non-immigrant status. On January 1, 2001, Dr. Kasthuri obtained a change of non-immigrant status from J-1 to H-1B status.[9] On June 23, 2001, Dr. Kasthuri began working for Columbia Basin Imaging in Richland, Washington, a federally-designated shortage area. It appears that Dr. Kasthuri continues to work there.

On March 31, 2003, Dr. Kasthuri's employer filed an immigrant visa petition and national interest waiver request on Dr. Kasthuri's behalf with the DHS. It appears that sometime between March 31, 2003 and August 9, 2004 the DHS sent Dr. Kasthuri a request for evidence relating to the immigrant visa petition. The DHS contends that Dr. Kasthuri did not respond to the request, and that it accordingly denied his applications due to abandonment on August 9, 2004. Dr. Kasthuri disputes the contention and submits evidence that suggests that he responded to the request.

### B.  Proceedings Below

The Immigrant Doctors brought this action for declaratory and injunctive relief on December 4, 2002 in the United States District Court for the Central District of California. Specifically, the Immigrant Doctors sought: (1) a declaration

---

[9]As with Dr. Schneider, this is significant because medical practice engaged in while in J-1 non-immigrant status does *not* count towards the aggregate three-year or five-year medical practice requirement. *See* 8 U.S.C. § 1153(b)(2)(B)(ii)(II), (IV).

that the five parts of the Secretary's implementing regulations discussed in Part II. were inconsistent with, and *ultra vires* to, the Nursing Relief Act; and (2) a permanent injunction enjoining the Secretary from enforcing those portions of the regulations against them.

On December 1, 2003, the Immigrant Doctors moved for summary judgment. On March 26, 2004, the district court found that the Immigrant Doctors were not entitled to summary judgment, and dismissed the action, concluding that "the portions of the Rule objected to by plaintiffs do not impermissibly contradict the INA or the Nursing Relief Act." The Immigrant Doctors filed this timely appeal.

## IV.  ANALYSIS

An agency's interpretation or application of a statute is a question of law that we review *de novo*. *See Halaim v. INS*, 358 F.3d 1128, 1131 (9th Cir. 2004); *Vernazza v. SEC*, 327 F.3d 851, 858 (9th Cir. 2003), *amended by* 335 F.3d 1096 (9th Cir. 2003).

In reviewing an agency's statutory construction, we must reject those constructions that are contrary to clear congressional intent or that frustrate the policy that Congress sought to implement. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984); *see also Natural Res. Def. Council, Inc. v. EPA*, 966 F.2d 1292, 1297 (9th Cir. 1992) ("On questions of statutory construction, courts must carry out the unambiguously expressed intent of Congress.").

In *Chevron*, 467 U.S. 837, the Supreme Court set forth a two-part test for judicial review of administrative agency interpretations of federal law. *See id.* at 842-43. First, "[i]f the intent of Congress is clear, that is the end of the matter." *Id.* "Congressional intent may be determined by 'traditional tools of statutory construction,' and if a court using these tools ascertains that Congress had a clear intent on the question at

issue, that intent must be given effect as law." *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1059 (9th Cir. 2003) (en banc) (citations omitted), *amended by* 360 F.3d 1374 (9th Cir. 2004).

Second, if the statute is silent or ambiguous with respect to the issue at hand, then the reviewing court must defer to the agency so long as "the agency's answer is based on a permissible construction of the statute." *Wilderness Soc'y*, 353 F.3d at 1059 (citing *Chevron*, 467 U.S. at 843). "In such a case an agency's interpretation of a statute will be permissible, unless 'arbitrary, capricious, or manifestly contrary to the statute.' " *Id.* (quoting *Chevron*, 467 U.S. at 844).

### A.   Shortage Area Medical Practice that Occurred Before the Approval of the Immigrant Visa Petition and National Interest Waiver

[1] The Immigrant Doctors' first regulatory challenge concerns a doctor's medical practice in a designated shortage area that occurred before the approval of the doctor's immigrant visa petition and national interest waiver.[10] The Nursing Relief Act states that an immigrant doctor cannot receive LPR status until the doctor has worked in a designated shortage area for an aggregate of three or five years.[11] *See* 8 U.S.C. § 1153(b)(2)(B)(ii)(II), (IV). The Secretary's implementing rule indicates that the medical practice requirement "clock" begins to run "on the date of the notice approving the [immigrant visa petition] and the national interest waiver." 8 C.F.R. § 245.18(e). Thus, under the Secretary's regulation, any medical practice in a designated shortage area that occurred before the approval of the immigrant visa petition and national interest waiver *does not count* towards the medical practice requirement.[12] The question then, is whether the regulation that

---

[10]We refer to this type of medical practice as "prior medical practice."

[11]We refer to this restriction as the "medical practice requirement."

[12]It is noteworthy that this portion of the Secretary's regulation has profound consequences for the Immigrant Doctors in this case. Dr. Schneider

excludes prior medical practice in designated shortage areas from counting towards the medical practice requirement is in conflict with, and is *ultra vires* to, the Nursing Relief Act.

Under the first prong of *Chevron*, 467 U.S. 837, we use traditional tools of statutory construction to determine whether Congress expressed a clear intent on the issue in question. *Id.* at 842-43. We conclude that Congress clearly intended prior medical practice to count towards the medical practice requirement because: (1) the plain language of the statute makes Congress's intent clear; (2) a contrary conclusion would render another section of the Nursing Relief Act mere surplusage; and (3) Congress expressly excluded medical practice while in J-1 non-immigrant status from the medical practice requirement but did not exempt any other qualifying practice.

**[2]** The plain language of the Nursing Relief Act demonstrates that Congress intended prior medical practice to count towards the medical practice requirement. Congress required that an immigrant doctor work full time as a physician in a qualifying area for "an aggregate" of three or five years before obtaining LPR status.[13] *See* 8 U.S.C. § 1153(b)(2)(B)

---

began working in a shortage area on September 1, 1998, but his immigrant visa petition and national interest waiver were not approved until June 26, 2003, nearly five years later. Those five years of shortage-area practice do not count towards the practice requirement. Dr. Tandar began working in a shortage area in August 1997, but his immigrant visa petition and national interest waiver were not approved until September 11, 2001, over four years later. Dr. Mamuya began working in a shortage area in July 1999, but the DHS did not approve his immigrant visa petition until September 11, 2001, over two years later. Dr. Kasthuri began working in a shortage area on June 23, 2001, and still does not have an approved immigrant visa petition and national interest waiver. Each of these doctors would have completed, or nearly completed, the medical practice requirement if prior medical practice were considered.

[13]The five-year medical practice requirement reads in relevant part:

(ii)(II), (IV). We have previously held that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *United States v. Smith*, 155 F.3d 1051, 1057 (9th Cir. 1998) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). Merriam-Webster's Dictionary defines "aggregate" as "formed by the collection of units or particles into a body, mass, or amount." Merriam-Webster's Collegiate Dictionary 24 (11th ed. 2005).[14] Thus, applying the definition to this statute, Congress intended that an immigrant doctor work for a *total period* of three or five years in a designated shortage area. Congress intended that

> No permanent resident visa may be issued to an alien physician . . . and the Attorney General may not adjust the status of such an alien physician from that of a nonimmigrant alien to that of a permanent resident alien . . . until such time as the alien has worked full time as a physician for an aggregate of 5 years (not including the time served in the status of an alien described in section 1101(a)(15)(J) of this title), in an area or areas designated by the Secretary of Health and Human Services as having a shortage of health care professionals . . . .

8 U.S.C. § 1153(b)(2)(B)(ii)(II).

The three-year medical practice requirement reads in relevant part:

> In the case of a physician for whom an application for a waiver was filed under subsection (b)(2)(B) of this section prior to November 1, 1998, the Attorney General shall grant a national interest waiver pursuant to subsection (b)(2)(B) of this section except that the alien is required to have worked full time as a physician for an aggregate of 3 years (not including time served in the status of an alien described in section 1101(a)(15)(J) of this title) before a[n] [immigrant] visa can be issued to the alien . . . or the status of the alien is adjusted to permanent resident . . . .

8 U.S.C. § 1153(b)(2)(B)(ii)(IV).

[14]Black's Law Dictionary defines "aggregate" as "[f]ormed by combining into a single whole or total" or "[a]n assemblage of particulars; an agglomeration." Black's Law Dictionary 66 (7th ed. 1999). We note that the common definition and legal definition of "aggregate" are substantially similar such that reliance on either definition would produce the same outcome.

separate, fractured "units or particles" of shortage-area medical practice could be combined to meet the total three or five-year requirement. By using the word "aggregate," Congress intended to comprehensively include even short periods of qualifying medical practice to make the requirement flexible. The statutory language makes clear that Congress contemplated counting prior medical practice towards the medical practice requirement.

**[3]** A conclusion to the contrary would render other provisions of the Nursing Relief Act extraneous. "[W]e strive to avoid constructions that render words meaningless." *United States v. LSL Biotechnologies*, 379 F.3d 672, 679 (9th Cir. 2004) (citation omitted). Congress specified that nothing in the medical practice requirement should be construed to prevent an immigrant doctor from filing an immigrant visa petition before the doctor completes the medical practice requirement. *See* 8 U.S.C. § 1153(b)(2)(B)(ii)(III) ("Nothing in this subparagraph may be construed to prevent the filing of a[n] [immigrant visa] petition . . . by an alien physician . . . prior to the date by which such alien physician has completed the [medical practice requirement] . . . ."). The wording of this subsection demonstrates that Congress contemplated the possibility that an immigrant doctor might *complete* the medical practice requirement before filing the immigrant visa petition; the Secretary's regulation does precisely the opposite — it prevents an immigrant doctor from *starting* the medical practice requirement until the immigrant visa petition has been approved. Indeed, if we were to accept the Secretary's regulation as proper, subsection (b)(2)(B)(ii)(III) would be surplusage.

Finally, it is a well-established maxim of statutory interpretation that the expression of one thing is the exclusion of another. *See ARC Ecology v. U.S. Dep't of the Air Force*, 411 F.3d 1092, 1099-1100 (9th Cir. 2005) ("[O]missions are the equivalent of exclusions when a statute affirmatively designates certain persons, things, or manners of operation."). Con-

gress expressly exempted from the medical practice requirement any medical practice performed while the immigrant doctor had J-1 non-immigrant status. *See* 8 U.S.C. § 1153(b)(2)(B)(ii)(II), (IV). But that was the *only* restriction that Congress imposed on qualifying medical practice. By exempting J-1 medical practice from the medical practice requirement while not exempting medical practice engaged in before approval of the immigrant visa petition, it is clear that Congress intended that prior medical practice would count towards the medical practice requirement.

[4] Congress selected unambiguous language in the Nursing Relief Act that demonstrates its intent that, with the exception of practice engaged in while in J-1 non-immigrant status, all medical practice in designated shortage areas counts towards the medical practice requirement. By contrast, the Secretary's implementing regulation excludes otherwise qualifying medical practice if it occurred before the approval of the immigrant visa petition. Because the Secretary's regulation is contrary to Congress's clear intent, we hold that the regulation is in conflict with, and is *ultra vires* to, the Nursing Relief Act.[15]

---

[15]Although we cannot consider legislative history under the first prong of *Chevron*, 467 U.S. at 842-43, we note that the Secretary's regulation subverts the very intent of the Nursing Relief Act. Congress created the Act "to assist the underserved communities of this Nation by providing adequate health care for their residents." 144 Cong. Rec. H6931, H6933 (1998). Congress reasoned that, "[b]y allowing alien physicians and the medical facilities that employ them to avoid the labor certification process, this provision ensures that residents of areas with a shortage of health care professionals will have access to quality health care." 145 Cong. Rec. H11,321, H11,322 (1999). The Secretary's regulation contravenes the very incentive — swift LPR processing — that Congress crafted to attract immigrant doctors to health professional shortage areas.

### B. National Interest Waiver Applications Filed Before November 1, 1998

[5] The Immigrant Doctors' second regulatory challenge focuses on the impact that a previously filed national interest waiver request has on the medical practice requirement. Congress indicated that an immigrant doctor "for whom an application for a [national interest] waiver was filed . . . prior to November 1, 1998" would only be required to work for an aggregate period of three years in a designated shortage area before the alien would be eligible for LPR status.[16] *See* 8 U.S.C. § 1153(b)(2)(B)(ii)(IV). The Secretary's implementing regulation, however, divides the group of doctors who applied for a national interest waiver before November 1, 1998 into two sub-groups: (1) doctors who were denied a national interest waiver before November 12, 1999, *see* 8 C.F.R. § 204.12(d)(6); and (2) doctors whose petitions were still pending as of November 12, 1999, *see* 8 C.F.R. § 204.12(d)(4). The regulation requires the first group — doctors whose applications were denied before November 12, 1999 — to fulfill the five-year medical practice requirement instead of the three-year medical practice requirement. *See* 8 C.F.R. § 204.12(d)(6) (permitting immigrant doctors denied a national interest waiver before November 12, 1999 to "file a new [immigrant visa] petition" under the provisions of 8 U.S.C. § 1153(b)(2)(B)(ii), which contains the five-year medical practice requirement).

Only Dr. Tandar raises this claim. His employer requested a discretionary national interest waiver on his behalf on June 1, 1998, before Congress enacted the Nursing Relief Act. The DHS denied Dr. Tandar's first application on June 21, 1999, finding that Dr. Tandar had "not established that a waiver . . . will be in the national interest of the United States." The Secretary argues that Dr. Tandar must meet the five-year medical practice requirement. Dr. Tandar argues that, because his

---

[16]For the statutory text of 8 U.S.C. § 1153(b)(2)(B)(ii)(IV), *see* note 13.

employer filed his first application for a national interest waiver before November 1, 1998, he should only have to comply with the three-year medical practice requirement. The plain language of the statute and traditional tools of statutory construction compel the conclusion that the Secretary's regulation is at odds with Congress's clear intent in enacting the Nursing Relief Act.

The plain meaning of "was filed" is simply that application was made.[17] *See* Random House Unabridged Dictionary 531 (1973). It does not mean that an application was filed *and remains pending* on a certain date.[18] To require that the application remained pending on a certain date imposes a new requirement that is not contemplated by Congress.

[6] As outlined above, *Chevron*'s first prong directs that, if the statutory language is clear and unambiguous, the court must give effect to the "plain meaning" of those words. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). Here, Congress created a *single* condition precedent to the application of the three-year, instead of the five-year, medical practice requirement: that an application for a national interest waiver "was filed . . . prior to November 1, 1998." *See* 8 U.S.C. § 1153(b)(2)(B)(ii)(IV). The Secretary's regulation, however, changes the statutory requirement with respect to an entire class of doctors. It is plain to us that the Secretary's regulation conflicts with the Nursing Relief Act.

---

[17]The instant case does not require us to conduct a detailed examination of proper "filing," such as timely delivery, fee submission, or date of receipt. It is clear that the DHS received Dr. Tandar's application and accepted it for processing before November 1, 1998. Nothing in the record suggests that the DHS denied Dr. Tandar's application due to a defect related to its filing; on the contrary, the record shows that DHS denied the application on the merits.

[18]As with "aggregate" in Part IV.A. above, the legal definition of "file" is similar to the common definition. *See* Black's Law Dictionary 642 (7th ed. 1999) ("To deliver a legal document to the court clerk or record custodian for placement into the official record.").

As a matter of common sense, the Secretary's regulation produces outcomes that contradict the plain language of the statute. The statute clearly intends to subject to a three-year medical practice requirement doctors whose employers applied for a national interest waiver before November 1, 1998. The regulation, however, requires some of those doctors instead to meet the five-year requirement.

Dr. Tandar's case is illustrative. An application for a national interest waiver *was filed* on Dr. Tandar's behalf before November 1, 1998. Yet, the Secretary's regulation requires Dr. Tandar to complete the five-year medical practice requirement. This anomalous outcome highlights the fact that the regulation fails to give effect to the plain language of the statute. The regulation plainly conflicts with Congress's clearly-expressed intent.

**[7]** Because the Secretary's implementing regulation is contrary to Congress's clear intent, we hold that this portion of the regulation is in conflict with, and is *ultra vires* to, the Nursing Relief Act.

## C. The Four and Six-Year Limitations Periods on Completion of the Medical Practice Requirement

**[8]** The Immigrant Doctors' third claim challenges the regulation that limits the total time period in which an immigrant doctor must complete the medical practice requirement. As discussed above, the Nursing Relief Act provides that an immigrant doctor who receives a national interest waiver cannot obtain LPR status until the doctor has practiced in a shortage area for an "aggregate" term of three or five years.[19] *See* 8 U.S.C. § 1153(b)(2)(B)(ii)(II), (IV). The Secretary's implementing regulation conforms to the Act's practice requirements, but imposes additional limitations periods. Specifically, an immigrant doctor subject to the five-year

---

[19]For the statutory text of the practice requirements, *see* note 13.

medical practice requirement must practice for an aggregate of five years during the six-year period following the approval of the immigrant visa petition and national interest waiver request. *See* 8 C.F.R. § 204.12(b)(1) ("[T]he beneficiary physician must complete the aggregate 5 years of qualifying full-time clinical practice during the 6-year period beginning on the date of approval of the [immigrant visa petition]."). An immigrant doctor subject to the three-year requirement must practice for an aggregate of three years during the four-year period following the approval of the immigrant visa petition and national interest waiver request. *See* 8 C.F.R. § 204.12(d)(4) ("The physician must complete the aggregate of 3 years of medical service within the 4-year period beginning on the date of the approval of the [immigrant visa] petition . . . ."). That is, the Secretary's regulation imposes a strict time limit during which an immigrant doctor must complete the medical practice requirement. The Immigrant Doctors contend that the limitations period conflicts with the Nursing Relief Act. We agree.

Under the first prong of the *Chevron* approach, we again ask whether Congress expressed a clear intent on the issue in question. *See Chevron*, 467 U.S. at 842-43. If the statutory language is clear and unambiguous, the court must give effect to the "plain meaning" of those words. *See Robinson*, 519 U.S. at 340.

Under the Nursing Relief Act, an immigrant doctor cannot obtain LPR status "until such time as the alien has worked full time as a physician for an aggregate of [3 or] 5 years." 8 U.S.C. § 1153(b)(2)(B)(ii)(II), (IV). This requirement makes sense. As discussed above, Congress passed the Nursing Relief Act to "ensure[ ] that residents of areas with a shortage of health care professionals will have access to quality health care." 145 Cong. Rec. H11,321, H11,322 (1999). To ensure that an immigrant doctor contributes substantially to remedying the health professional shortage problem, Congress refused to allow an immigrant doctor to obtain LPR status

until the doctor had served a shortage community for three or five years. Congress imposed no additional conditions precedent to a grant of LPR status.

**[9]** Congress clearly intended that no limitations period should be imposed on the aggregate medical practice requirement. Congress did not impose a limitations period of its own accord. Congress instead used particular language to the contrary — language that cannot be read to have left a "gap" for the agency to fill. Congress restricted immigrant doctors from obtaining LPR status "until *such time*" as the doctor had practiced in a shortage area for an "aggregate" of three or five years. *See* 8 U.S.C. § 1153(b)(2)(B)(ii)(II), (IV) (emphasis added). Congress did not place a limit on "such time," demonstrating that the time period would be open-ended. Furthermore, Congress used the word "aggregate" that invokes a summation of fractured parts and contemplates interruptions. *See* Part IV.A. Nothing in the Nursing Relief Act can be read to authorize the Secretary to promulgate a regulation that imposes a strict limitations period.

We are confident that Congress would have imposed a limitations period if it had so intended. Congress has crafted detailed time limitations in other portions of the INA that demonstrate its ability to make clear its intent with regard to statutory time periods. *See, e.g.*, 8 U.S.C. § 1229b(d)(2) (discussing breaks in ten years of continuous physical presence for purposes of cancellation of removal, noting that any single departure "in excess of 90 days or for any periods in the aggregate exceeding 180 days" interrupt continuous presence); 8 U.S.C. § 1229c(b)(1), (2) (granting voluntary departure for a period not "exceeding 60 days" to certain aliens who have been physically present in the United States for at least one year before service of the charging document, and who have had good moral character for at least five years); 8 U.S.C. § 1255a(a)(1) (granting adjustment of status to aliens who entered the United States before January 1, 1982, provided that the alien apply for adjustment "during the 12-

month period beginning on a date (not later than 180 days after November 6, 1986) designated by the Attorney General," but within thirty days of the service of any order to show cause).

The regulation, however, imposes a strict limitations period not contemplated by the Nursing Relief Act. If an immigrant doctor fails to comply with the regulatory limitations period, the DHS will "deny the application for adjustment of status and revoke approval of the [immigrant] visa petition and national interest waiver." 65 Fed. Reg. 53,889, 53,890 (Sept. 6, 2000). The regulation imposes on an immigrant doctor a temporal obligation not required by statute.

The Secretary argues that such a limitations period is necessary. After all, absent a limitations period, the Nursing Relief Act would potentially entitle an immigrant doctor to an indefinite pending immigration status.[20] The immigrant doctor could lawfully engage in non-shortage medical practice without penalty.

The Secretary's argument is well taken, but the fact remains that Congress expressly permitted interruptions in qualifying medical service by using the word "aggregate." Although the Secretary may believe that Congress made a mistake by passing the law as it did, the Secretary cannot re-

---

[20]This is so because, under the Nursing Relief Act, an immigrant doctor can apply for adjustment of status based on the approved immigrant visa petition and national interest waiver, but cannot obtain LPR status until the doctor has met the medical practice requirement. If the immigrant doctor were given an unlimited time to complete the medical practice requirement, the application for adjustment to LPR status would remain pending until the immigrant doctor had completed the medical practice requirement. During the pendency of an application for adjustment to LPR status, the immigrant doctor is authorized to remain in the United States and is entitled to apply for employment authorization. *See* 8 C.F.R. § 274a.12(c)(9). Accordingly, the immigrant doctor could remain in the United States working in any type of job until the doctor, at his leisure, fulfills the medical practice requirement.

write the law. The Secretary is charged with "the administration and enforcement" of the INA and "shall establish such regulations" as he deems necessary to enforce the INA. 8 U.S.C. § 1103(a)(1), (3). He may not, however, impose obligations not required by law. The Secretary must defer to the supremacy of Congress's legislative enactments just as the courts may not appropriate Congress's legislative function. "There is a basic difference between filling a gap left by Congress'[s] silence and rewriting rules that Congress has affirmatively and specifically enacted." *Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004) (internal quotation omitted); *see also United States v. Locke*, 471 U.S. 84, 95 (1985) ("[D]eference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill, generally requires us to assume that the legislative purpose is expressed by the ordinary meaning of the words used.") (internal quotation omitted).

**[10]** Accordingly, we hold that the Secretary's regulation that imposes a strict limitations period without statutory basis conflicts with Congress's clear intent, and is *ultra vires* to, the Nursing Relief Act.

### D. Specialist Doctors' Eligibility for a National Interest Waiver

In their fourth challenge to the regulations, the Immigrant Doctors argue that certain specialist doctors are eligible for national interest waivers under the Nursing Relief Act, but not under the Secretary's regulations. Congress instructed that a national interest waiver "shall" issue to "any alien physician" who agrees to work in a designated shortage area. *See* 8 U.S.C. § 1153(b)(2)(B)(ii)(I). The Secretary's implementing regulation states that only doctors who practice "in a medical speciality that is within the scope of the Secretary's designation for the geographical area or areas" will be eligible for a national interest waiver. 8 C.F.R. § 204.12(a)(2)(i). The

Immigrant Doctors argue that the regulation conflicts with the statute.

We must first address the threshold question whether the Immigrant Doctors have standing to bring this challenge. Dr. Kasthuri, a radiologist, is the only specialist amongst the Immigrant Doctors. Dr. Kasthuri has worked in a designated shortage area since June 23, 2001. His employer filed an immigrant visa petition and national interest waiver request on his behalf on March 31, 2003. In his opening brief, Dr. Kasthuri asserted that the applications were still pending.

The Secretary argues that Dr. Kasthuri's claim is moot, because the DHS denied Dr. Kasthuri's immigrant visa petition and national interest waiver request on August 9, 2004. The Secretary avers that the DHS sent Dr. Kasthuri a request for evidence to which Dr. Kasthuri did not respond, and that the government accordingly denied his petition. In response to an order of this court, the government produced the denial of Dr. Kasthuri's immigrant visa petition. The denial indicates that Dr. Kasthuri did not respond to a request for additional evidence, and that DHS therefore denied his application "due to abandonment."

There is some dispute over whether Dr. Kasthuri ever received the notice of denial of his immigrant visa petition. But the question of notice is not before us. Our threshold inquiry is whether Dr. Kasthuri, or any other Immigrant Doctor, has standing to challenge this portion of the regulation.

**[11]** "[F]ederal courts are without power to decide questions that cannot affect the rights of litigants in the case before them." *North Carolina v. Rice*, 404 U.S. 244, 246 (1971); *see also* U.S. Const. art. III, § 2, cl. 1. The inability of the federal judiciary "to review moot cases derives from the requirement of Article III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy." *Liner v. Jafco, Inc.*, 375 U.S. 301, 306 n.3 (1964). The

"irreducible constitutional minimum of standing contains three elements": (1) injury in fact; (2) causation; and (3) likelihood that a favorable decision will redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

**[12]** The DHS denied Dr. Kasthuri's petition because of abandonment, not because the DHS found Dr. Kasthuri ineligible for a national interest waiver. Dr. Kasthuri's argument that the regulation caused his injury must fail. Similarly, a favorable ruling on the regulatory challenge would not redress Dr. Kasthuri's injury; any decision rendered by this court on the issue would be an advisory opinion that would have no impact on the rights of the parties. "It has long been settled that we have no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before us." *DHX, Inc. v. Allianz AGF MAT, Ltd.*, 425 F.3d 1169, 1174 (9th Cir. 2005) (internal quotation omitted). Dr. Kasthuri's claim became moot when his immigrant visa petition and national interest waiver request were denied because of abandonment. We therefore dismiss this part of the appeal and decline to reach the merits of the claim.

## E.   Reporting Compliance with the Nursing Relief Act

Fifth, the Immigrant Doctors allege that the Secretary's implementing regulation imposes a double compliance system that is contrary to the statute. Specifically, the Immigrant Doctors argue that a doctor should not be required to apprise the DHS twice about the progress that he or she has made towards the medical practice requirement.

**[13]** Under the Secretary's regulation, immigrant doctors subject to the five-year medical practice requirement must submit certain evidence within 120 days of the completion of the second year of the medical practice requirement, *see* 8 C.F.R. § 245.18(g)(1), and additional evidence within 120 days of completing the fifth year of the medical practice

requirement, 8 C.F.R. § 245.18(h). If an immigrant doctor fails to comply, the DHS will first serve the doctor with a notice of intent to deny the application for adjustment to LPR status. *See* 8 C.F.R. § 245.18(i). Absent evidence demonstrating compliance, the DHS will then deny the application for LPR status and revoke the approved immigrant visa petition and national interest waiver. *See id.*

[14] In contrast to Parts IV.A. - IV.C. above, the Nursing Relief Act does *not* discuss compliance with the medical practice requirement that it prescribes. Congress was silent regarding compliance. Yet, as with any other benefit conferred under the INA, Congress surely contemplated that applicants would be required to submit evidence of their entitlement to the accelerated path to LPR status. The statute thus left a "gap" within the meaning of *Chevron*'s first prong to be filled by the agency. *See Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1162 (9th Cir. 1999), *amended by* 197 F.3d 1035 (9th Cir. 1999). Because the statute is silent with respect to the issue at hand, we ask only whether the Secretary's implementing regulation is not an arbitrary or capricious but a permissible construction of the statute. *See Wilderness Soc'y*, 353 F.3d at 1059 (citing *Chevron*, 467 U.S. at 843). We must defer to the regulation unless the Secretary's interpretation is contrary to clear congressional intent or frustrates the policy Congress sought to implement. *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1172 (9th Cir. 2002).

[15] The Secretary determined that immigrant doctors would be required to submit evidence of their compliance with the statutory scheme under the Nursing Relief Act. *See* 8 C.F.R. § 245.18(g), (h). It is eminently reasonable for the Secretary to require multiple submissions of evidence from the immigrant doctor if the immigrant doctor is subject to the lengthy five year medical practice requirement.[21] The five-

---

[21]We observe that Immigrant Doctors subject to the three-year medical practice requirement are only required to submit evidence once. *See* 8 C.F.R. § 245.18(g)(2). It thus appears that the Nursing Relief Act's lengthy five-year medical practice requirement animated the need for double compliance.

year medical practice requirement is longer than many other statutory periods in the INA, and its length justifies the multiple compliance requests. *See, e.g.,* 8 C.F.R. § 216.2(b) (requiring conditional permanent residents to submit additional evidence "90 days before the second anniversary" of the grant of conditional permanent resident status where statutory period is only two years).

**[16]** We cannot say that the compliance system devised by the Secretary is in any way contrary to congressional intent or that it frustrates a policy Congress sought to implement. The Immigrant Doctors cited virtually no authority to the contrary. Because the Secretary's compliance period is a permissible construction of the statute that is not arbitrary and capricious, we hold that the compliance system is not in conflict with, and is not *ultra vires* to, the Nursing Relief Act.

## V.  CONCLUSION

For the foregoing reasons we hold that the following portions of the Secretary's regulation are in conflict with, and are *ultra vires* to, the Nursing Relief Act: (1) the exclusion from the medical practice requirement of shortage-area medical practice that occurs before approval of the immigrant visa petition and national interest waiver; (2) the requirement that doctors who applied for a national interest waiver before November 1, 1998, but whose applications were denied before November 12, 1999, comply with the five-year medical practice requirement; and (3) the requirement that immigrant doctors complete the medical practice requirement within a four or six-year limitations period. We hold that the Immigrant Doctors lack standing to challenge the portion of the regulations that exclude specialist physicians like Dr. Kasthuri from obtaining a national interest waiver. Finally, we hold that the regulation that creates an alleged "double compliance" system is a permissible construction of the Nursing Relief Act that is not *ultra vires* to the Act.

We **AFFIRM** in part and **REVERSE** in part, and **REMAND** to the district court with instructions to enter declaratory and injunctive relief for the plaintiffs consistent with this opinion.